## SEMINOLE NATION *v.* UNITED STATES.*

No. 830.   Argued April 2, 1942.—Decided May 11, 1942.

*Mr. C. Maurice Weidemeyer,* with whom *Messrs. Paul M. Niebell* and *W. W. Pryor* were on the brief, for petitioner.

*Mr. Charles R. Denny,* with whom *Solicitor General Fahy* and *Assistant Attorney General Littell* were on the brief, for the United States.

MR. JUSTICE MURPHY delivered the opinion of the Court.

The question presented for decision is whether the United States remains under any obligation to the

*Opinion reported herein as amended by order of May 25, 1942, *post,* p. 647.

Seminole Nation with respect to Article III of the Treaty of March 21, 1866, 14 Stat. 755, 756, which provides in part:

". . . The United States having obtained by grant of the Creek nation the westerly half of their lands, hereby grant to the Seminole nation the portion thereof hereafter described, which shall constitute the national domain of the Seminole Indians. Said lands so granted by the United States to the Seminole nation are bounded and described as follows, to wit: Beginning on the Canadian river where the line dividing the Creek lands according to the terms of their sale to the United States by their treaty of February 6, 1866, following said line due north to where said line crosses the north fork of the Canadian river; thence up said north fork of the Canadian river a distance sufficient to make two hundred thousand acres by running due south to the Canadian river; thence down said Canadian river to the place of beginning. In consideration of said cession of two hundred thousand acres of land described above, the Seminole nation agrees to pay therefor the price of fifty cents per acre, amounting to the sum of one hundred thousand dollars, . . ."

Petitioner's claim is for just compensation for the alleged taking by the United States of an asserted deficiency in the tract granted by this Article.

Late in 1866, before the boundaries of the Seminole domain had been located, the Seminoles moved to what was assumed to be their treaty land.[1] The first survey

---

[1] Although negotiations were in progress with the Creeks at the time the Seminole treaty was made and a treaty was signed with them on February 6, 1866, the Creek treaty was not concluded until June 14, 1866. See 14 Stat. 785. The dividing line between the two halves of the Creek country was not settled until the Bardwell survey was approved in 1872.

of the line dividing the Creek and the Seminole terri-
tories, made by one Rankin, in 1868, under a contract
with the Superintendent of Indian Affairs, was not ap-
proved by the Department of the Interior. In 1871 one
Bardwell re-surveyed the dividing line and placed it seven
miles west of the Rankin line. Two months later, at
the direction of the Government, one Robbins ran the
western boundary of the Seminole lands so as to include
200,000 acres from the Bardwell line. According to
Robbins' calculations, 200,000.03 acres were included be-
tween the Canadian river on the south, the north fork of
the Canadian river on the north, the Bardwell line on
the east and the Robbins line on the west. The Bard-
well and Robbins surveys were both approved by the
Secretary of the Interior on February 5, 1872.

Meanwhile, pursuant to Article I of the Treaty of Febru-
ary 27, 1867, 15 Stat. 531,[2] the Pottawatomie tribe selected
a tract bounded "by the West line of the Seminole
lands," and on November 9, 1870, the Secretary of the In-
terior approved that selection. In 1872, after the location
of the Robbins line, the Pottawatomies occupied the terri-
tory immediately west of that line. Subsequently, the
Government allotted and patented the lands west of the
Robbins line to the Pottawatomies in severalty, or sold and

[2] By that Article the United States agreed that a delegation from
the Pottawatomies should accompany a government commission to the
Indian country ". . . in order to select, if possible, a suitable location
for their people without interfering with the locations made for other
Indians; and if such location shall be found satisfactory to the Potta-
watomies, and approved by the Secretary of the Interior, such tract of
land, not exceeding thirty miles square, shall be set apart as a reserva-
tion for the exclusive use and occupancy of that tribe; and upon the
survey of its lines and boundaries, and ascertaining of its area, and
payment to the United States for the same, as hereinafter mentioned
and set forth, the said tract shall be patented to the Pottawatomie
nation."

patented them to settlers and turned the purchase price into the Treasury as public money.[3]

The Bardwell survey disclosed that a considerable area east of the Seminole-Creek dividing line had been occupied by the Seminoles, who had made substantial improvements on this land. In order that the Seminoles might retain the lands which they had improved, Congress authorized negotiations for the purchase of these lands east of the Bardwell line. Act of March 3, 1873, 17 Stat. 626. An agreement was entered into on February 14, 1881, with the Creek Nation whereby that Nation ceded land east of the Bardwell line to the United States, the agreement providing that the eastern boundary of the land ceded was to be drawn so that the tract would aggregate 175,000 acres. *Creek Nation* v. *United States*, 93 Ct. Cls. 561, 566. The Creeks received $175,000 for this tract. Act of August 5, 1882, 22 Stat. 257, 265. This land became a part of the Seminole domain and was disposed of either by allotment to members of the tribe or by sale for the account of the tribe.

The possibility of a deficiency in the original 200,000 acre tract was first suspected in 1900.[4] By an amended

---

[3] Provision was made for allotting the lands to the Pottawatomies in severalty by Act of May 23, 1872, 17 Stat. 159, and Act of February 8, 1887, 24 Stat. 388. By an agreement ratified by Act of March 3, 1891, 26 Stat. 989, 1016–1017, the Pottawatomies ceded to the Government the tract assigned to them. It was stipulated in the agreement that all allotments in severalty, made or to be made, should be completed and confirmed, and that other allotments in severalty could be made until February 8, 1891. The ratifying act provided that the remaining lands were to be opened to settlement as public lands. 26 Stat. 1026.

[4] Letter from the Commissioner of Indian Affairs to the Secretary of the Interior, dated February 5, 1900.

Letter from the Acting Secretary of the Interior to the Commission to the Five Civilized Tribes, dated October 16, 1900.

petition filed in the Court of Claims in 1937,[5] the Seminole Nation alleged that, owing to an error in the location of the Robbins line, the territory enclosed between the Robbins and Bardwell lines was 11,550.54 acres short of 200,000 acres, and that the United States took from the Seminoles 11,550.54 acres west of the Robbins line when the Government patented that land to individuals in 1892 and subsequent years. Judgment was prayed against the United States for value at the time of taking of the 11,550.54 acres, with interest at the rate of five percent per annum. The Court of Claims made no finding as to whether a shortage in fact existed in the tract between the Bardwell and Robbins lines, but held that, in any event, the Seminole Nation was more than compensated for the alleged shortage by the Government's purchase for the Seminoles of 175,000 acres of land from the Creek Nation. The court also stated that, even if petitioner were entitled to recover for any deficit in the 200,000 acre tract, the Government would be entitled to offset the value of the 175,000 acre tract as a gratuitous expenditure under the Act of August 12, 1935, 49 Stat. 571, 596, a value assumed to be far in excess of the value of whatever deficit there may have been. We granted certiorari because of the close connection between this case and *Seminole Nation* v. *United States,* No. 348, *ante,* p. 286.[6]

The judgment of the Court of Claims cannot be sustained on either of the grounds advanced. The Government in this Court agrees to this proposition and

---

[5] The original petition was filed in 1930. The amended petition was filed after the amendment to the jurisdictional act. 43 Stat. 133, as amended by 50 Stat. 650.

[6] Petitioner has here limited its claim to 10,351.82 acres, adopting the shortage given in the report, dated March 18, 1941, of Arthur D. Kidder, District Cadastral Engineer of the General Land Office, who surveyed the area after the original petition was filed.

suggests that the cause be remanded to the Court of Claims.

## I

Underlying the denial of recovery for any deficit in the 200,000 acre tract because petitioner was compensated therefor "fifteen-fold" by the receipt of an additional 175,000 acres, is the theory that the acquisition of land by the Seminoles under the Treaty of 1866 and the acquisition of additional land to the east by transfer from the Creeks in 1882 were but two parts of an integral transaction, intended to give the Seminoles 200,000 acres of land and thus discharge the obligation of the Treaty of 1866. However, the facts do not support that theory, for in 1882 the suggestion that a shortage existed in the supposed 200,000 acre tract between the Bardwell and Robbins lines had not yet been advanced. There was therefore no thought at the time the transfer of the 175,000 acre tract was made that the Government thereby fulfilled its treaty obligation by compensating the Seminoles for a deficiency in the original tract.

## II

The Act of August 12, 1935, 49 Stat. 571, 596, directs the Court of Claims, in suits by an Indian tribe or band, "to consider and to offset against any amount found due the said tribe or band all sums expended gratuitously by the United States for the benefit of the said tribe or band." This language plainly requires the Court of Claims to find, first, that money is due from the United States, to consider then whether the United States has gratuitously spent sums for the benefit of the tribe and, if it finds such gratuitous expenditures, to offset them against the amount found due.

In allowing the gratuity offset here, the Court of Claims fell short of complying with the requirements of the offset

statute. There was no finding that the United States was under any liability to the Seminole Nation; the Court stated only that the value of the 175,000 acre tract was "far in excess of the value of whatever deficit there may have been." The shortcomings of this approach are evident. As we said in *Seminole Nation* v. *United States*, No. 348, *ante*, p. 286, gratuity offsets resemble a fund in a bank, to be drawn on by the Government as needed. If the Government owes nothing, it is entitled to a dismissal on that ground, and should not be compelled to use its gratuity offsets. If liability exists on the Government's part, the exact amount of gratuitous expenditures utilized to extinguish that liability, in whole or in part, should be precisely found and designated. The Government should not be held to satisfy its liability by the use of gratuity expenditures in excess of the liability. Conversely, the Indian tribe is entitled to have an exact determination of the amount owed it by the United States in order that an amount of gratuity expenditures equal to the liability may be exhausted, or that, if the available offsets are insufficient, it receive a money judgment for the difference. Otherwise, confusion and the possibility of a double credit for a single offset arise, as this case and No. 348 abundantly demonstrate. In the latter case, a gratuity offset in the amount of $165,847.17 on account of the purchase of the 175,000 acre tract from the Creeks was allowed, and here the assumed value of that tract is the offset employed by the Court of Claims.

The judgment is reversed and the cause remanded to the Court of Claims with directions to consolidate it with No. 348; to determine whether a shortage exists in the 200,000 acre tract; to determine whether the Government is liable therefor, and the amount of such liability, if a shortage exists; and, to find and designate the precise gratuitous expenditures used to offset the total liability,

if any, arising from this claim and from Items Two and Five of No. 348.

*Reversed.*

Mr. Justice Reed took no part in the consideration or decision of this case.

Mr. Justice Jackson dissents.