GRAYSON v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:GRAYSON v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 GRAYSON v. STATE
2021 OK CR 8
Case Number: F-2018-1229
Decided: 04/01/2021
KADETRIX DEVON GRAYSON, Appellant v. STATE OF OKLAHOMA, Appellee.

Cite as: 2021 OK CR 8, __ __

 

OPINION REMANDING WITH INSTRUCTIONS TO DISMISS
KUEHN, PRESIDING JUDGE:
¶1 Kadetrix Devon Grayson was tried by jury and convicted of Counts I and II, First Degree Murder, and Count III, Possession of a Firearm After Former Conviction of a Felony, in the District Court of Seminole County, Case No. CF-2015-370. Following the jury's recommendation, the Honorable George Butner sentenced Appellant to life imprisonment on each of Counts I and II, to run consecutively, and ten (10) years imprisonment on Count III, to run concurrently. Appellant must serve 85% of his sentences on Counts I and II before becoming eligible for parole consideration. Appellant appeals from these convictions and sentences.
¶2 Appellant raises five propositions of error in support of his appeal:
1. Counsel was ineffective because he refused to adequately communicate with Mr. Grayson and allow Mr. Grayson to assist in his own defense.
2. Counsel was ineffective for failing to question the medical examiner regarding Ms. Gokey's broken ribs.
3. The trial court lacked jurisdiction because all parties allegedly involved were Native American and the crimes allegedly happened on Seminole Nation Tribal Territory.
4. The trial court abused its discretion in refusing to give a "credibility of informers" instruction.
5. The accumulation of error in this case deprived Mr. Grayson of due process of law and a reliable sentencing proceeding in violation of the Fourteenth Amendment to the United States Constitution and Article II, §§ 7 and 20 of the Oklahoma Constitution.
¶3 In Proposition III Appellant claims the State of Oklahoma did not have jurisdiction to prosecute him. He relies on 18 U.S.C. § 1153 and McGirt v. Oklahoma, 591 U.S. __, 140 S.Ct. 2452 (2020).
¶4 On August 25, 2020, this Court remanded this case to the District Court of Seminole County for an evidentiary hearing. The District Court was directed to make findings of fact and conclusions of law on two issues: (a) Appellant's status as an Indian; and (b) whether the crime occurred within the boundaries of the Seminole Nation Reservation. Our Order provided that, if the parties agreed as to what the evidence would show with regard to the questions presented, the parties could enter into a written stipulation setting forth those facts, and no hearing would be necessary.
¶5 On October 26, 2020, the District Court filed its Findings of Fact and Conclusions of Law. The parties agreed by stipulation that Grayson is a member of the Seminole Nation, with some Indian blood, and was at the time of the crimes, and that the Seminole Nation is a federally recognized tribe.
¶6 The District Court found that Congress established a reservation for the Seminole Nation of Oklahoma. As the State took no position on the issue, the District Court found that these facts are uncontroverted: 
1. The Treaty of Payne's Landing, 7 Stat. 368 (1832) (1832 Treaty), provided that the Seminoles would relinquish all claims to the lands they occupied in Florida and emigrate to "the country assigned to the Creek, west of the Mississippi River." Id. art. I. The 1832 Treaty was made to implement the Indian Removal Act, Pub. L. 21-148, 4 Stat 411 (1830).
2. The Treaty with the Creeks, 7 Stat. 417 (1833 Creek Treaty), provided that the Seminole Nation shall "have a permanent and comfortable home" by themselves on lands set aside for the Creek Nation. Id. art. IV. The Seminoles and the United States entered into the Treaty with the Seminole, confirming the Creek Treaty's provisions on March 28, 1833. Treaty with the Seminoles, art. IV, 7 Stat. 423 (1833) (1833 Seminole Treaty). The Seminole Nation's desire for genuine political autonomy resulted in the Treaty with the Creeks and Seminoles, 11 Stat. 699 (1856) (1856 Treaty). The 1856 Treaty, entered into on August 7, 1856, set forth specific boundaries for the Seminole Nation Reservation. Id. art. 1.
3. Ten years later, the United States and the Seminole Nation entered into the Treaty with the Seminole, 14 Stat. 755 (1866) (1866 Treaty). This redefined the boundaries of the Seminole Nation Reservation. For payment of the fixed sum of $325,362.00, the Seminoles ceded and conveyed the entirety of their previous territory to the United States, guaranteed to them under the 1856 Treaty. Id. art. 3. The Treaty established a new reservation, carved from part of the western half of the Creek Nation Reservation, to "constitute the national domain of the Seminole Indians." Id. art. 3. These boundaries were:
Beginning on the Canadian River where the line dividing the Creek lands according to the terms of their sale to the United States by their treaty of February 6, 1866, following said line due north to where said line crosses the north fork of the Canadian River; thence up said north fork of the Canadian River a distance sufficient to make two hundred thousand acres by running due south to the Canadian River; thence down said Canadian river to the place of beginning. Id. art. 3.
4. The precise boundaries of the Reservation set forth in the 1866 Treaty depended on the determination of the location of "the line dividing the Creek lands according to the terms of their sale to the United States by their treaty of February 6, 1866. . . ." 1866 Treaty, art. 3, 14 Stat. 755. The original line was surveyed by Rankin in 1867 but never formally approved. In 1871, the Department of the Interior instead adopted the line from the Bardwell survey, which was seven miles west of the Rankin line. This discrepancy led to considerable uncertainty for Seminole Nation citizens living within the disputed corridor. In 1881, the United States purchased those lands from the Creek Nation and included them in the Seminole Reservation. Seminole Nation v. United States, 316 U.S. 310, 313 (1942); 22 Stat. 257, 265 (1882).
5. The boundaries of the Seminole Nation of Oklahoma Reservation remain those defined in the 1866 Treaty, plus the land purchased from the Creek Nation in 1881.
¶7 The District Court found, and we agree, that the absence of the word "reservation" in the 1866 Treaty is not dispositive. McGirt, 140 S.Ct. at 2461. And subsequent acts of Congress referred to the Seminole Reservation. See, e.g., Act of March 3, 1891, 26 Stat. 989, 1016 (1891); 11 Cong. Rec. 2351 (1881). The record supports the District Court's findings that by treaty and purchase, the United States established a reservation for the Seminole Nation of Oklahoma.
¶8 The District Court found that Congress has not disestablished the Seminole Nation Reservation. After Congress has established a reservation, only Congress may disestablish it by clearly expressing its intent to do so; usually, this will require "an explicit reference to cession or other language evidencing the present and total surrender of all tribal interests." McGirt, 140 S.Ct. at 2463 (internal quotation omitted). The District Court found no explicit indication or expression of Congressional intent to disestablish the Seminole Reservation. The State took no position on this issue, and the Court found:
1. Allotment did not disestablish the Reservation. Allotment of Seminole tribal lands was formally authorized in 1893. Act of March 3, 1893, 27 Stat. 612, at 645. The Dawes Commission and the Seminole Nation reached an allotment agreement on December 16, 1897, ratified by Congress on July 1, 1898. Act of July 1, 1898, 30 Stat. 567, at 567. This created three land classes based on appraised value; each tribal member would be allotted a share of land of equal value, with sole right of occupancy; the allotments were inalienable until the date of the patent, with some leases allowed. Id. Nowhere in either the allotment statute or the agreement is there language indicating an intent to disestablish the Reservation. There is no mention of cession, a fixed sum in return for total surrender of tribal claims, or any other text supporting disestablishment. As McGirt made clear, allotment may be a step towards disestablishment but is not itself a clear expression of the intention to disestablish a reservation. McGirt, 140 S.Ct. at 2465; see also Mattz v. Arnett, 412 U.S. 481, 497 (allotment entirely consistent with continued reservation status).
2. Although Congress has, from time to time, imposed restrictions on the sovereignty of the Seminole Nation, these restrictions did not disestablish the Reservation. For example, the Act of March 3, 1903, stated that the tribal government of the Seminole Nation "shall not continue" past March 4, 1906. Act of March 3, 1903, 34 Stat. 982, 1008 (1903). However, in March 1906, Congress did not terminate the Seminole Nation tribal government. Instead, in the Five Tribes Act, Congress recognized that the existence of the Seminole Nation tribe and tribal government "are hereby continued in full force and effect for all purposes authorized by law." Five Tribes Act, 34 Stat. 137, 148 (1906). This Act restricted the tribal government's power, but it neither terminated the Nation nor expressly indicated an intent to disestablish the Reservation.
3. Oklahoma statehood did not disestablish the Reservation. The Oklahoma Enabling Act, 34 Stat. 267 (1906), authorized Oklahoma statehood. It contains nothing suggesting that, by allowing statehood, Congress intended to disestablish the Seminole Reservation. The Act expressly prohibited the Oklahoma constitution from limiting the federal government's authority to make laws or regulations respecting Indians living within the new state's boundaries. Id., 34 Stat at 267-68. Congress never disestablished the Seminole Reservation, and it currently exists.
4. The parties stipulated to the current boundaries of the Seminole Nation Reservation. The parties further stipulated that the location of the crimes charged was within the historical boundaries of the Seminole Nation of Oklahoma Reservation.
5. The District Court adopted a map, attached as Exhibit A to the Seminole Nation's brief filed in the District Court, showing those stipulated boundaries. The District Court first noted that, with one deviation, the borders of Seminole County set forth in the Oklahoma Constitution are defined by reference to the Seminole Reservation boundaries:
Beginning at a point where the east boundary line of the Seminole nation intersect[s] the center line of the South Canadian River; thence north along the east boundary line of said Seminole nation to its intersection with the township line between townships seven and eight North; thence east along said township line to the southwest corner of section thirty-five, township eight North, range eight East; thence north along the section line between sections thirty-four and thirty-five, in said township and range, projected to its intersection with the centerline of the North Canadian River; thence westward along the center line of said river to its intersection with the east boundary line of Pottawatomie County; thence southward along said east boundary line to its intersection with the centerline of the South Canadian River; thence down along the center line of said river to the point of beginning. Wewoka is hereby designated the County Seat of Seminole County. 
Okla. Const. art. 17, § 8.
¶9 The District Court described the Reservation northeastern boundary thus: County lines depart from the Reservation border, beginning at the point where the Reservation's eastern boundary intersects with the line between townships seven and eight north (just southwest of the intersection of East/West Rd. 131 and State Highway 56). From that point, the County line runs due east for slightly less than three miles (until reaching the southwest corner of section 35 of Township 8 North, Range 8 East). Then the County line runs due north until the midpoint of the North Canadian River, at which point the County line runs along the river back toward the Seminole Nation.
¶10 The District Court found that Congress has never, by treaty or statute, either erased the Seminole Nation Reservation boundaries or expressed an intent to do so or disestablish the Reservation otherwise. The record supports the District Court's findings that the United States has not disestablished the Seminole Nation of Oklahoma Reservation.
¶11 After making these findings of fact, the District Court reached the following conclusions of law:
1. The Defendant/Appellant is an "Indian" as defined by the Oklahoma Court of Criminal Appeals.
2. By applying the analysis set out in McGirt, Congress established a reservation for the Seminole Nation of Oklahoma.
3. By using the analysis set out in McGirt, Congress has not explicitly erased the reservation boundaries and disestablished the Seminole Nation Reservation.
4. The Seminole Nation of Oklahoma is "Indian Country" for purposes of criminal law jurisdiction.
5. The Crimes that Defendant/Appellant was convicted of occurred in Indian Country.
¶12 In its Supplemental Brief, Appellee does not contest the District Court's findings and conclusions. The record supports the findings of fact, and we adopt the conclusions of law. Appellant is a member of the Seminole Nation, and the crimes were committed within the boundaries of the Seminole Nation Reservation. The ruling in McGirt applies to this case. The District Court of Seminole County did not have jurisdiction to try Appellant.
¶13 Accordingly, Proposition III is granted. Propositions I, II, IV, and V are moot.
DECISION
The Judgment and Sentence of the District Court of Seminole County is VACATED, and the case is REMANDED with instructions to DISMISS. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2020), the MANDATE is STAYED for twenty (20) days from the delivery and filing of this decision.
AN APPEAL FROM THE DISTRICT COURT OF SEMINOLE COUNTY
THE HONORABLE GEORGE BUTNER, DISTRICT JUDGE




ATTORNEYS AT TRIAL

ATTORNEYS ON APPEAL







LARRY R. MONARD

BOBBY G. LEWIS


P.O. BOX 471

HOMICIDE DIRECT APPEALS DIV.


ANADARKO, OK 73005-471

OKLA. INDIGENT DEFENSE SYS.


COUNSEL FOR DEFENDANT

P.O. BOX 926




NORMAN, OK 73070




COUNSEL FOR APPELLANT







PAUL B. SMITH

MIKE HUNTER


DISTRICT ATTORNEY

ATTORNEY GENERAL OF OKLA.


SEMINOLE COUNTY

JENNIFER L. CRABB


120 S. WEWOKA

ASST. ATTORNEY GENERAL


WEWOKA, OK 74884

313 NE 21ST STREET


COUNSEL FOR THE STATE

OKLAHOMA CITY, OK 73105




COUNSEL FOR APPELLEE

OPINION BY KUEHN, P.J.
ROWLAND, V.P.J.: CONCUR LUMPKIN, J.: CONCUR IN RESULTS
LEWIS, J.: SPECIALLY CONCUR
HUDSON, J.: CONCUR IN RESULTS




LUMPKIN, JUDGE: CONCURRING IN RESULTS:
¶1 Bound by my oath and the Federal-State relationships dictated by the U.S. Constitution, I must at a minimum concur in the results of this opinion. While our nation's judicial structure requires me to apply the majority opinion in the 5-4 decision of the U.S. Supreme Court in McGirt v. Oklahoma, __ U.S. __, 140 S. Ct. 2452 (2020), I do so reluctantly. Upon the first reading of the majority opinion in McGirt, I initially formed the belief that it was a result in search of an opinion to support it. Then upon reading the dissents by Chief Justice Roberts and Justice Thomas, I was forced to conclude the Majority had totally failed to follow the Court's own precedents, but had cherry picked statutes and treaties, without giving historical context to them. The Majority then proceeded to do what an average citizen who had been fully informed of the law and facts as set out in the dissents would view as an exercise of raw judicial power to reach a decision which contravened not only the history leading to the disestablishment of the Indian reservations in Oklahoma, but also willfully disregarded and failed to apply the Court's own precedents to the issue at hand.
¶2 My quandary is one of ethics and morality. One of the first things I was taught when I began my service in the Marine Corps was that I had a duty to follow lawful orders, and that same duty required me to resist unlawful orders. Chief Justice Roberts's scholarly and judicially penned dissent, actually following the Court's precedents and required analysis, vividly reveals the failure of the majority opinion to follow the rule of law and apply over a century of precedent and history, and to accept the fact that no Indian reservations remain in the State of Oklahoma.
[1] The result seems to be some form of "social justice" created out of whole cloth rather than a continuation of the solid precedents the Court has established over the last 100 years or more.
¶3 The question I see presented is should I blindly follow and apply the majority opinion or do I join with Chief Justice Roberts and the dissenters in McGirt and recognize "the emperor has no clothes" as to the adherence to following the rule of law in the application of the McGirt decision?
¶4 My oath and adherence to the Federal-State relationship under the U.S. Constitution mandate that I fulfill my duties and apply the edict of the majority opinion in McGirt. However, I am not required to do so blindly and without noting the flaws of the opinion as set out in the dissents. Chief Justice Roberts and Justice Thomas eloquently show the Majority's mischaracterization of Congress's actions and history with the Indian reservations. Their dissents further demonstrate that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed. I take this position to adhere to my oath as a judge and lawyer without any disrespect to our Federal-State structure. I simply believe that when reasonable minds differ they must both be reviewing the totality of the law and facts.
FOOTNOTES
[1] Senator Elmer Thomas, D-Oklahoma, was a member of the Senate Committee on Indian Affairs. After hearing the Commissioner's speech regarding the Indian Reorganization Act (IRA) in 1934, Senator Thomas opined as follows:
I can hardly see where it (the IRA) could operate in a State like mine where the Indians are all scattered out among the whites and they have no reservation, and they could not get them into a community without you would go and buy land and put them on it. Then they would be surrounded very likely with thickly populated white sections with whom they would trade and associate. I just cannot get through my mind how this bill can possibly be made to operate in a State of thickly-settled population. (emphasis added).
John Collier, Commissioner of Indian Affairs, Memorandum of Explanation (regarding S. 2755), p. 145, hearing before the United States Senate Committee on Indian Affairs, February 27, 1934. Senator Morris Sheppard, D-Texas, also on the Senate Committee on Indian Affairs, stated in response to the Commissioner's speech that in Oklahoma, he did not think "we could look forward to building up huge reservations such as we have granted to the Indians in the past." Id. at 157. In 1940, in the Foreword to Felix S. Cohen, Handbook of Federal Indian Law (1942), Secretary of the Interior Harold Ickes wrote in support of the IRA, "[t]he continued application of the allotment laws, under which Indian wards have lost more than two-thirds of their reservation lands, while the costs of Federal administration of these lands have steadily mounted, must be terminated." (emphasis added).




LEWIS, JUDGE, SPECIALLY CONCURRING:
¶1 Based on my special writings in Bosse v. State, 2021 OK CR 3, ___ P.3d ___ and Hogner v. State, 2021 OK CR 4, ___ P.3d ___, I specially concur. Following the precedent of McGirt v. Oklahoma, 140 S.Ct. 2452 (2020), Oklahoma has no jurisdiction over an Indian who commits a crime in Indian Country, or over any person who commits a crime against an Indian in Indian Country. This crime occurred within the historical boundaries of the Seminole Nation Reservation and that Reservation has not been expressly disestablished by the United States Congress. Additionally, Appellant is an Indian, thus the jurisdiction is governed by the Major Crimes Act found in the United States Code.
¶2 Oklahoma, therefore, has no jurisdiction, concurrent or otherwise, over Appellant in this case. Thus, I concur that this case must be reversed and remanded with instructions to dismiss. Jurisdiction is in the hands of the United States Government. 




HUDSON, J., CONCUR IN RESULTS:
¶1 Today's decision applies McGirt v. Oklahoma, 140 S. Ct. 2452 (2020) to the facts of this case and dismisses convictions from Seminole County for two counts of first degree murder and one count of felonious possession of a firearm. I concur in the results of the majority's opinion based on the stipulations below concerning the Indian status of Appellant and the location of these crimes within the historic boundaries of the Seminole Reservation. Under McGirt, the State cannot prosecute Appellant because of his Indian status and the occurrence of the murders and felonious possession of firearm within Indian Country as defined by federal law. I therefore as a matter of stare decisis fully concur in today's decision. 
¶2 I disagree, however, with the majority's adoption as binding precedent that Congress never disestablished the Seminole Reservation. Here, the State took no position below on whether the Seminole Nation has, or had, a reservation. The State's tactic of passivity has created a legal void in this Court's ability to adjudicate properly the facts underlying Appellant's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. We should find no abuse of discretion based on the record evidence presented. But we should not establish as binding precedent that the Seminole Reservation was never disestablished based on this record.
¶3 Finally, I write separately to note that McGirt resurrects an odd sort of Indian reservation. One where a vast network of cities and towns dominate the regional economy and provide modern cultural, social, educational and employment opportunities for all people on the reservation. Where the landscape is blanketed by modern roads and highways. Where non-Indians own property (lots of it), run businesses and make up the vast majority of inhabitants. On its face, this reservation looks like any other slice of the American heartland--one dotted with large urban centers, small rural towns and suburbs all linked by a modern infrastructure that connects its inhabitants, regardless of race (or creed), and drives a surprisingly diverse economy. This is an impressive place--a modern marvel in some ways--where Indians and non-Indians have lived and worked together since at least statehood, over a century.
¶4 McGirt orders us to forget all of that and instead focus on whether Congress expressly disestablished the reservation. We are told this is a cut-and-dried legal matter. One resolved by reference to treaties made with the Five Civilized Tribes dating back to the nineteenth century. Ignore that Oklahoma has continuously asserted jurisdiction over this land since statehood, let alone the modern demographics of the area.
¶5 The immediate effect under federal law is to prevent state courts from exercising criminal jurisdiction over a large swath of Greater Tulsa and much of eastern Oklahoma. Yet the effects of McGirt range much further. Crime victims and their family members in a myriad of cases previously prosecuted by the State can look forward to a do-over in federal court of the criminal proceedings where McGirt applies. And they are the lucky ones. Some cases may not be prosecuted at all by federal authorities because of issues with the statute of limitations, the loss of evidence, missing witnesses or simply the passage of time. All of this foreshadows a hugely destabilizing force to public safety in eastern Oklahoma. 
¶6 McGirt must seem like a cruel joke for those victims and their family members who are forced to endure such extreme consequences in their case. One can certainly be forgiven for having difficulty seeing where--or even when--the reservation begins and ends in this new legal landscape. Today's decision on its face does little to vindicate tribal sovereignty and even less to persuade that a reservation in name only is necessary for anybody's well-being. The latter point has become painfully obvious from the growing number of cases that come before this Court where non-Indian defendants are challenging their state convictions using McGirt because their victims were Indian.
¶7 Congress may have the final say on McGirt. In McGirt, the court recognized that Congress has the authority to take corrective action, up to and including disestablishment of the reservation. We shall see if any practical solution is reached as one is surely needed. In the meantime, cases like Appellant's remain in limbo until federal authorities can work them out. Crime victims and their families are left to run the gauntlet of the criminal justice system once again, this time in federal court. And the clock is running on whether the federal system can keep up with the large volume of new cases undoubtedly heading their way from state court.




 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA