SIZEMORE v. STATE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:SIZEMORE v. STATE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 SIZEMORE v. STATE
2021 OK CR 6
485 P.3d 867
Case Number: F-2018-1140
Decided: 04/01/2021
DEVIN WARREN SIZEMORE, Appellant v. STATE OF OKLAHOMA, Appellee.
Cite as: 2021 OK CR 6, 485 P.3d 867

 

 

O P I N I O N

ROWLAND, VICE PRESIDING JUDGE:

¶1 This appeal turns on whether Appellant Devin Warren Sizemore is an Indian as defined by federal law, and whether he committed murder and assault and battery upon a police officer within Indian country as that term is defined by federal law. Because the answer to both questions is yes, federal law grants exclusive criminal jurisdiction to the federal government on the murder charge at the very least and possibly the assault charge as well. Regardless, the State of Oklahoma was without jurisdiction to prosecute him.

1. Factual Background

¶2 In July of 2016, police in Krebs, Oklahoma were contacted by Sizemore's family members, worried about his and his twenty-one month old daughter's safety. Some fifteen hours after this call to police, officers searching for the pair heard screaming from a local pond and discovered Sizemore there. Upon seeing the police, he fled into the water and officers encountered him near what appeared to be a small body floating face down. Attempts to subdue him resulted in a fight both in and out of the water, but the officers eventually took him into custody. His young daughter was pulled from the water but did not survive; she had drowned.

¶3 Sizemore was tried by jury in the District Court of Pittsburg County, Case No. CF-2016-593, and convicted of First Degree Murder (Count 1), in violation of 21 O.S.Supp.2012, § 701.7 and Battery/Assault and Battery on a Police Officer (Count 2), in violation of 21 O.S.Supp.2015, § 649. In accordance with the jury's verdict, the Honorable Tim Mills, Associate District Judge, sentenced Sizemore to life imprisonment without the possibility of parole on Count 1 and five years imprisonment on Count 2, with the sentences to be served concurrently.

¶4 In this direct appeal, Sizemore alleges the following errors:

(1) The State of Oklahoma lacked jurisdiction to prosecute him because he is an "Indian" and the crime occurred in "Indian Country";

(2) He received ineffective assistance of trial counsel;

(3) The evidence was insufficient to prove all elements of First Degree Murder beyond a reasonable doubt;

(4) The district court erred in admitting his recorded interrogation;

(5) The district court erred by denying his motion to quash his arrest; and

(6) An accumulation of error deprived him of a fair trial.

¶5 Because, as noted above, we find relief is required on Sizemore's jurisdictional challenge in Proposition 1, his other claims are moot.

2. The Legal Background

A. The Major Crimes Act

¶6 Title 18 Section 1153 of the United States Code, known as the Major Crimes Act, grants exclusive federal jurisdiction to prosecute certain enumerated offenses committed by Indians within Indian country. It reads in relevant part as follows:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a) (2013).

¶7 Count 1, the murder charge, fits squarely within the Major Crimes Act and its exclusive federal jurisdiction, but whether Count 2 is among these enumerated crimes is much less clear. It may constitute a "felony assault under section 113", but that is not something we must decide today. If the assault on a police officer is not covered by Section 1153, it is subject to the Act's sister statute, 18 U.S.C. § 1152 (1948), which applies to other offenses and provides for federal or tribal jurisdiction. In either event, the State of Oklahoma was without jurisdiction to prosecute such an assault by an Indian within Indian country. See State v. Klindt, 1989 OK CR 75, ¶ 3, 782 P.2d 401, 403 ("[T]he State of Oklahoma does not have jurisdiction over crimes committed by or against an Indian in Indian Country.")

B. McGirt v. Oklahoma

¶8 Nothing we have said thus far is in any way new, as these federal statutes asserting federal criminal jurisdiction in Indian country are more than one hundred years old. What has recently changed is the definition of Indian country, within the borders of Oklahoma, for purposes of these statutes. In McGirt v. Oklahoma, 591 U.S. __, 140 S.Ct. 2452 (2020), the Supreme Court held that land set aside for the Muscogee-Creek Nation in the 1800's was intended by Congress to be an Indian reservation, and that this reservation exists today for purposes of federal criminal law because Congress has never explicitly disestablished it. Although the case now before us involves the lands of the Choctaw Nation, we find McGirt's reasoning controlling.

3. Two Questions Upon Remand

A. Sizemore's Status as Indian

¶9 After McGirt was decided, this Court, on August 19, 2020, remanded this case to the District Court of Pittsburgh County for an evidentiary hearing. The District Court was directed to make findings of fact and conclusions of law on two issues: (a) Sizemore's status as an Indian; and (b) whether the crime occurred in Indian Country, namely within the boundaries of the Choctaw Nation Reservation. Our Order provided that, if the parties agreed as to what the evidence would show with regard to the questions presented, the parties could enter into a written stipulation setting forth those facts, and no hearing would be necessary. On October 14, 2020, the parties stipulated to the first of these requirements, agreeing that (1) Sizemore has some Indian blood; (2) he was an enrolled member of the Choctaw Nation on the date of the charged offenses; and (3) the Choctaw Nation is a federally recognized tribe. Judge Mills accepted this stipulation and found that on the date of the charged crimes, Sizemore was an Indian for purposes of federal law. We adopt the district court's findings and conclusion.

B. Whether Crimes Were Committed
in Indian Country

1. Congress Established a Choctaw Reservation
in the 1800s

¶10 As to the second question on remand, whether the crimes were committed in Indian country, the stipulation of the parties was less dispositive. They acknowledged only that the charged crimes occurred within the historical geographic area of the Choctaw Nation as designated by various treaties. The stipulation went on to state that the crimes occurred in Indian country "only if the Court determines that those treaties established a reservation, and if the Court further concludes that Congress never explicitly erased those boundaries and disestablished that reservation."

¶11 In a thorough and well-reasoned order, Judge Mills examined the 19th century treaties between the Choctaw Nation and the United States of America. He concluded that the land set aside for the Choctaw Nation, beginning with the Treaty of Dancing Rabbit Creek in 1830, as reaffirmed and modified by the Treaty of Washington in 1855, and further modified by the post-civil war Treaty of Washington in 1866, established a Choctaw Reservation.

¶12 This finding is consistent with McGirt, where the majority found it "obvious" that a similar course of dealing between Congress and the Creeks had created a reservation, even though that term had not always been used to refer to the lands set aside for them, "perhaps because that word had not yet acquired such distinctive significance in federal Indian law." McGirt, 140 S.Ct. at 2461. Following the reasoning in McGirt, Judge Mills ruled that through its treaties with the Choctaw Nation, Congress established a Choctaw Reservation in the 1800's.

2. Congress Has Never Disestablished 
the Choctaw Reservation

¶13 "To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress." McGirt, 140 S.Ct. at 2462. No particular words or verbiage are required, but there must be a clear expression of congressional intent to terminate the reservation.

History shows that Congress knows how to withdraw a reservation when it can muster the will. Sometimes, legislation has provided an "[e]xplicit reference to cession" or an "unconditional commitment ... to compensate the Indian tribe for its opened land." Ibid. Other times, Congress has directed that tribal lands shall be "'restored to the public domain.'" Hagen v. Utah, 510 U.S. 399, 412, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (emphasis deleted). Likewise, Congress might speak of a reservation as being "'discontinued,'" "'abolished,'" or "'vacated.'" Mattz v. Arnett, 412 U.S. 481, 504, n. 22, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). Disestablishment has "never required any particular form of words," Hagen, 510 U.S., at 411, 114 S.Ct. 958. But it does require that Congress clearly express its intent to do so, "[c]ommon[ly with an] '[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests.'" Nebraska v. Parker, 577 U. S. 481, -------- -- --------, 136 S.Ct. 1072, 1079, 194 L.Ed.2d 152 (2016).

Id., 140 S.Ct. 2462--63.

¶14 The record before the district court in this case, similar to that in McGirt, shows Congress, through treaties, removed the Choctaw people from one area of the United States to another where they were promised certain lands. Subsequent treaties redefined the geographical boundaries of those lands, but nothing in any of those documents showed a congressional intent to erase the boundaries of the Reservation and terminate its existence.[1] Congress, and Congress alone, has the power to abrogate those treaties, and "this Court [will not] lightly infer such a breach once Congress has established a reservation." McGirt, 140 S.Ct. at 2462 (citing Solem v. Bartlett, 465 U.S. 463, 470, (1984)).

¶15 Noting that the State of Oklahoma presented no evidence to show that Congress erased or disestablished the boundaries of the Choctaw Nation Reservation, and citing language from McGirt noting that allotment of individual plots of land within this area do not equate to disestablishment, Judge Mills found that the Choctaw Reservation remains in existence. This finding is supported by the record.

¶16 We hold that for purposes of federal criminal law, the land upon which the parties agree Sizemore allegedly committed these crimes is within the Choctaw Reservation and is thus Indian country. The ruling in McGirt governs this case and requires us to find the District Court of Pittsburgh County did not have jurisdiction to prosecute Sizemore. Accordingly, we grant Proposition 1.

DECISION

¶17 The Judgment and Sentence of the district court is VACATED and this matter is REMANDED WITH INSTRUCTIONS TO DISMISS. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021), the MANDATE is ORDERED to issue in twenty (20) days from the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT
OF PITTSBURG COUNTY
THE HONORABLE TIMOTHY E. MILLS
ASSOCIATE DISTRICT JUDGE

 
 
 
 APPEARANCES AT TRIAL

 MATTHEW T. SHEETS
 SHEETS LAW FIRM, P.C.
 321 S. 3RD STREET, SUITE 12
 MCALESTER, OK 74501
 COUNSEL FOR DEFENDANT

 J. MICHAEL MILLER
 ATTORNEY AT LAW
 323 ½ E. CARL ALBERT PKWY.
 MCALESTER, OK 74501
 COUNSEL FOR DEFENDANT

 CHARLES D. SULLIVAN
 AMANDA SELF
 ASST. DISTRICT ATTORNEYS
 115 E. CARL ALBERT PKWY.
 MCALESTER, OK 74501
 COUNSEL FOR STATE
 
 
 APPEARANCES ON APPEAL

 KATIE BOURASSA
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT

 MIKE HUNTER
 ATTORNEY GENERAL
 OF OKLAHOMA
 TAYLOR L. LEDFORD
 ASSISTANT ATTORNEY
 GENERAL
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 
 
 APPEARANCES AT
 EVIDENTIARY HEARING

 KATIE BOURASSA
 OKLAHOMA INDIGENT
 DEFENSE SYSTEM
 P.O. BOX 926
 NORMAN, OK 73070
 COUNSEL FOR APPELLANT

 CHUCK SULLIVAN
 ASST DISTRICT ATTORNEY
 109 E. CARL ALBERT PKWY.
 McALESTER, OK 74501
 COUNSEL FOR STATE

 MIKE HUNTER
 ATTORNEY GENERAL
 OF OKLAHOMA
 JULIE PITTMAN
 CAROLINE HUNT
 ASST. ATTORNET GENERALS
 313 N.E. 21ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 OTHER APPEARANCES

 JACOB KEYES
 ATTORNEY AT LAW
 CHOCTAW NATIONAL
 JUDICIAL BRANCH
 P.O. BOX 1210
 DURANT, OK 74702
 AMICUS CURIAE
 
 
 

 

OPINION BY: ROWLAND, V.P.J.
KUEHN, P.J.: Concur
LUMPKIN, J.: Concur in Results
LEWIS, J.: Specially Concur
HUDSON, J.: Concur in Results

FOOTNOTES

[1] The State presented no evidence or argument on whether a reservation was ever established or disestablished for the Choctaw Nation.

LUMPKIN, JUDGE: CONCURRING IN RESULTS:

¶1 Bound by my oath and the Federal-State relationships dictated by the U.S. Constitution, I must at a minimum concur in the results of this opinion. While our nation's judicial structure requires me to apply the majority opinion in the 5-4 decision of the U.S. Supreme Court in McGirt v. Oklahoma, __ U.S. __, 140 S. Ct. 2452 (2020), I do so reluctantly. Upon the first reading of the majority opinion in McGirt, I initially formed the belief that it was a result in search of an opinion to support it. Then upon reading the dissents by Chief Justice Roberts and Justice Thomas, I was forced to conclude the Majority had totally failed to follow the Court's own precedents, but had cherry picked statutes and treaties, without giving historical context to them. The Majority then proceeded to do what an average citizen who had been fully informed of the law and facts as set out in the dissents would view as an exercise of raw judicial power to reach a decision which contravened not only the history leading to the disestablishment of the Indian reservations in Oklahoma, but also willfully disregarded and failed to apply the Court's own precedents to the issue at hand.

¶2 My quandary is one of ethics and morality. One of the first things I was taught when I began my service in the Marine Corps was that I had a duty to follow lawful orders, and that same duty required me to resist unlawful orders. Chief Justice Roberts's scholarly and judicially penned dissent, actually following the Court's precedents and required analysis, vividly reveals the failure of the majority opinion to follow the rule of law and apply over a century of precedent and history, and to accept the fact that no Indian reservations remain in the State of Oklahoma.[1] The result seems to be some form of "social justice" created out of whole cloth rather than a continuation of the solid precedents the Court has established over the last 100 years or more.

¶3 The question I see presented is should I blindly follow and apply the majority opinion or do I join with Chief Justice Roberts and the dissenters in McGirt and recognize "the emperor has no clothes" as to the adherence to following the rule of law in the application of the McGirt decision?

¶4 My oath and adherence to the Federal-State relationship under the U.S. Constitution mandate that I fulfill my duties and apply the edict of the majority opinion in McGirt. However, I am not required to do so blindly and without noting the flaws of the opinion as set out in the dissents. Chief Justice Roberts and Justice Thomas eloquently show the Majority's mischaracterization of Congress's actions and history with the Indian reservations. Their dissents further demonstrate that at the time of Oklahoma Statehood in 1907, all parties accepted the fact that Indian reservations in the state had been disestablished and no longer existed. I take this position to adhere to my oath as a judge and lawyer without any disrespect to our Federal-State structure. I simply believe that when reasonable minds differ they must both be reviewing the totality of the law and facts.

FOOTNOTES

[1] Senator Elmer Thomas, D-Oklahoma, was a member of the Senate Committee on Indian Affairs. After hearing the Commissioner's speech regarding the Indian Reorganization Act (IRA) in 1934, Senator Thomas opined as follows:

I can hardly see where it (the IRA) could operate in a State like mine where the Indians are all scattered out among the whites and they have no reservation, and they could not get them into a community without you would go and buy land and put them on it. Then they would be surrounded very likely with thickly populated white sections with whom they would trade and associate. I just cannot get through my mind how this bill can possibly be made to operate in a State of thickly-settled population. (emphasis added).

John Collier, Commissioner of Indian Affairs, Memorandum of Explanation (regarding S. 2755), p. 145, hearing before the United States Senate Committee on Indian Affairs, February 27, 1934. Senator Morris Sheppard, D-Texas, also on the Senate Committee on Indian Affairs, stated in response to the Commissioner's speech that in Oklahoma, he did not think "we could look forward to building up huge reservations such as we have granted to the Indians in the past." Id. at 157. In 1940, in the Foreword to Felix S. Cohen, Handbook of Federal Indian Law (1942), Secretary of the Interior Harold Ickes wrote in support of the IRA, "[t]he continued application of the allotment laws, under which Indian wards have lost more than two-thirds of their reservation lands, while the costs of Federal administration of these lands have steadily mounted, must be terminated." (emphasis added).

LEWIS, JUDGE, SPECIALLY CONCURRING:

¶1 Based on my special writings in Bosse v. State, 2021 OK CR 3, ___ P.3d ___ and Hogner v. State, 2021 OK CR 4, ___ P.3d ___, I specially concur. Following the precedent of McGirt v. Oklahoma, 140 S.Ct. 2452 (2020), Oklahoma has no jurisdiction over an Indian who commits a crime in Indian Country, or over any person who commits a crime against an Indian in Indian Country. This crime occurred within the historical boundaries of the Choctaw Nation Reservation and that Reservation has not been expressly disestablished by the United States Congress. Additionally, Appellant is an Indian, thus the jurisdiction is governed by the Major Crimes Act found in the United States Code.

¶2 Oklahoma, therefore, has no jurisdiction, concurrent or otherwise, over Appellant in this case. Thus, I concur that this case must be reversed and remanded with instructions to dismiss. Jurisdiction is in the hands of the United States Government.

HUDSON, J., CONCUR IN RESULTS:

¶1 Today's decision applies McGirt v. Oklahoma, 140 S. Ct. 2452 (2020) to the facts of this case and dismisses convictions from Pittsburg County for first degree murder and assault and battery on a police officer. I concur in the results of the majority's opinion based on the stipulations below concerning the Indian status of Appellant and the location of this crime within the historic boundaries of the Choctaw Reservation. Under McGirt, the State cannot prosecute Appellant because of his Indian status and the occurrence of this murder within Indian Country as defined by federal law. I therefore as a matter of stare decisis fully concur in today's decision. 

¶2 I disagree, however, with the majority's adoption as binding precedent that Congress never disestablished the Choctaw Reservation. Here, the State took no position below on whether the Choctaw Nation has, or had, a reservation. The State's tactic of passivity has created a legal void in this Court's ability to adjudicate properly the facts underlying Appellant's argument. This Court is left with only the trial court's conclusions of law to review for an abuse of discretion. We should find no abuse of discretion based on the record evidence presented. But we should not establish as binding precedent that the Choctaw Nation was never disestablished based on this record.

¶3 Finally, I write separately to note that McGirt resurrects an odd sort of Indian reservation. One where a vast network of cities and towns dominate the regional economy and provide modern cultural, social, educational and employment opportunities for all people on the reservation. Where the landscape is blanketed by modern roads and highways. Where non-Indians own property (lots of it), run businesses and make up the vast majority of inhabitants. On its face, this reservation looks like any other slice of the American heartland--one dotted with large urban centers, small rural towns and suburbs all linked by a modern infrastructure that connects its inhabitants, regardless of race (or creed), and drives a surprisingly diverse economy. This is an impressive place--a modern marvel in some ways--where Indians and non-Indians have lived and worked together since at least statehood, over a century.

¶4 McGirt orders us to forget all of that and instead focus on whether Congress expressly disestablished the reservation. We are told this is a cut-and-dried legal matter. One resolved by reference to treaties made with the Five Civilized Tribes dating back to the nineteenth century. Ignore that Oklahoma has continuously asserted jurisdiction over this land since statehood, let alone the modern demographics of the area.

¶5 The immediate effect under federal law is to prevent state courts from exercising criminal jurisdiction over a large swath of Greater Tulsa and much of eastern Oklahoma. Yet the effects of McGirt range much further. Crime victims and their family members in a myriad of cases previously prosecuted by the State can look forward to a do-over in federal court of the criminal proceedings where McGirt applies. And they are the lucky ones. Some cases may not be prosecuted at all by federal authorities because of issues with the statute of limitations, the loss of evidence, missing witnesses or simply the passage of time. All of this foreshadows a hugely destabilizing force to public safety in eastern Oklahoma.

¶6 McGirt must seem like a cruel joke for those victims and their family members who are forced to endure such extreme consequences in their case. One can certainly be forgiven for having difficulty seeing where--or even when--the reservation begins and ends in this new legal landscape. Today's decision on its face does little to vindicate tribal sovereignty and even less to persuade that a reservation in name only is necessary for anybody's well-being. The latter point has become painfully obvious from the growing number of cases that come before this Court where non-Indian defendants are challenging their state convictions using McGirt because their victims were Indian.

¶7 Congress may have the final say on McGirt. In McGirt, the court recognized that Congress has the authority to take corrective action, up to and including disestablishment of the reservation. We shall see if any practical solution is reached as one is surely needed. In the meantime, cases like Appellant's remain in limbo until federal authorities can work them out. Crime victims and their families are left to run the gauntlet of the criminal justice system once again, this time in federal court. And the clock is running on whether the federal system can keep up with the large volume of new cases undoubtedly heading their way from state court.

 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 

Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 15, STATE ex rel. DISTRICT ATTORNEY v. WALLACE
Cited
 2021 OK CR 21, 497 P.3d 686, STATE ex rel. MATLOFF v. WALLACE
Discussed
 2021 OK CR 37, STATE v. LAWHORN
Discussed at Length
 2021 OK CR 38, MCCLAIN v. STATE
Discussed at Length


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1989 OK CR 75, 782 P.2d 401, STATE v. KLINDT
Discussed
 2021 OK CR 3, 484 P.3d 286, WITHDRAWN
Cited
 2021 OK CR 4, HOGNER v. STATE
Cited
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 649, Assault and Battery Upon Police Officer, Sheriff, etc. - Penalties
Cited
 21 O.S. 701.7, Murder in the First Degree
Cited


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA