STATE ex rel. MATLOFF v. WALLACE



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE ex rel. MATLOFF v. WALLACE

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE ex rel. MATLOFF v. WALLACE
2021 OK CR 21
497 P.3d 686
Case Number: PR-2021-366
Decided: 08/12/2021
STATE ex rel. MARK MATLOFF, DISTRICT ATTORNEY, Petitioner v. THE HONORABLE JANA WALLACE, ASSOCIATE DISTRICT JUDGE, Respondent.
Cite as: 2021 OK CR 21, 497 P.3d 686

 

 

OPINION

LEWIS, JUDGE:

¶1 The State of Oklahoma, by Mark Matloff, District Attorney of Pushmataha County, petitions this Court for the writ of prohibition to vacate the Respondent Judge Jana Wallace's April 12, 2021 order granting post-conviction relief. Judge Wallace's order vacated and dismissed the second degree murder conviction of Clifton Merrill Parish in Pushmataha County Case No. CF-2010-26. Because the Respondent's order is unauthorized by law and prohibition is a proper remedy, the writ is GRANTED.

FACTS

¶2 Clifton Parish was tried by jury and found guilty of second degree felony murder in March, 2012. The jury sentenced him to twenty-five years imprisonment. This Court affirmed the conviction on direct appeal in Parish v. State, No. F-2012-335 (Okl.Cr., March 6, 2014) (unpublished). Mr. Parish did not petition for rehearing, and did not petition the U.S. Supreme Court for certiorari within the allowed ninety-day time period. On or about June 4, 2014, Mr. Parish's conviction became final.[1]

¶3 On August 17, 2020, Mr. Parish filed an application for post-conviction relief alleging that the State of Oklahoma lacked subject matter jurisdiction to try and sentence him for murder under the Supreme Court's decision in McGirt v. Oklahoma, 140 S.Ct. 2452 (2020). Judge Wallace held a hearing and found that Mr. Parish was an Indian and committed his crime within the Choctaw Reservation, the continued existence of which was recently recognized by this Court, following McGirt, in Sizemore v. State, 2021 OK CR 6, ¶ 16, 485 P.3d 867, 871.

¶4 Because the Choctaw Reservation is Indian Country, Judge Wallace found that the State lacked subject matter jurisdiction to try Parish for murder under the Major Crimes Act. 18 U.S.C. § 1153. Applying the familiar rule that defects in subject matter jurisdiction can never be waived, and can be raised at any time, Judge Wallace found Mr. Parish's conviction for second degree murder was void and ordered the charge dismissed.

¶5 Judge Wallace initially stayed enforcement of the order. The State then filed in this Court a verified request for a stay and petitioned for a writ of prohibition against enforcement of the order granting post-conviction relief. In State ex rel. Matloff v. Wallace, 2021 OK CR 15, ___ P.3d ___, this Court stayed all proceedings and directed counsel for the interested parties to submit briefs on the following question:

In light of Ferrell v. State, 1995 OK CR 54, 902 P.2d 1113, United States v. Cuch, 79 F.3d 987 (10th Cir. 1996), Edwards v. Vannoy (No. 19-5807), 593 U.S. ___ (May 17, 2021), cases cited therein, and related authorities, should the recent judicial recognition of federal criminal jurisdiction in the Creek and Choctaw Reservations announced in McGirt and Sizemore be applied retroactively to void a state conviction that was final when McGirt and Sizemore were announced?

¶6 The parties and amici curiae[2] subsequently filed briefs on the question presented. For reasons more fully stated below, we hold today that McGirt v. Oklahoma announced a new rule of criminal procedure which we decline to apply retroactively in a state post-conviction proceeding to void a final conviction. The writ of prohibition is therefore GRANTED and the order granting post-conviction relief is REVERSED.

ANALYSIS

¶7 In state post-conviction proceedings, this Court has previously applied its own non-retroactivity doctrine--often drawing on, but independent from, the Supreme Court's non-retroactivity doctrine in federal habeas corpus--to bar the application of new procedural rules to convictions that were final when the rule was announced. See Ferrell v. State, 1995 OK CR 54, ¶¶ 5-9, 902 P.2d 1113, 1114-15 (citing Teague, supra) (finding new rule governing admissibility of recorded interview was not retroactive on collateral review); Baxter v. State, 2010 OK CR 20, ¶ 11, 238 P.3d 934, 937 (noting our adoption of Teague non-retroactivity analysis for new rules in state post-conviction review); and Burleson v. Saffle, 278 F.3d 1136, 1141 n.5 (10th Cir. 2002) (noting incorporation "into state law the Supreme Court's Teague approach to analyzing whether a new rule of law should have retroactive effect," citing Ferrell, supra).

¶8 New rules of criminal procedure generally apply to cases pending on direct appeal when the rule is announced, with no exception for cases where the rule is a clear break with past law. See Carter v. State, 2006 OK CR 42, ¶ 4, 147 P.3d 243, 244 (citing Griffith v. Kentucky, 479 U.S. 314, 323 (1987)) (applying new instructional rule of Anderson v. State, 2006 OK CR 6, 130 P.3d 273 to case tried before the rule was announced, but pending on direct review). But new rules generally do not apply retroactively to convictions that are final, with a few narrow exceptions. Ferrell, 1995 OK CR 54, ¶ 7, 902 P.2d at 1114-15; Thomas v. State, 1994 OK CR 85, ¶ 13, 888 P. 2d 522, 527 (decision requiring that prosecution file bill of particulars no later than arraignment did not apply to convictions already final).

¶9 Following Teague and its progeny, we would apply a new substantive rule to final convictions if it placed certain primary (private) conduct beyond the power of the Legislature to punish, or categorically barred certain punishments for classes of persons because of their status (capital punishment of persons with insanity or intellectual disability, or juveniles, for example). See, e.g., Pickens v. State, 2003 OK CR 16, ¶¶ 8-9, 74 P.3d 601, 603 (retroactively applying Atkins v. Virginia, 536 U.S. 304 (2002) because Atkins barred capital punishment for persons with intellectual disability).

¶10 Under Ferrell, we also would retroactively apply a new "watershed" procedural rule that was essential to the accuracy of trial proceedings, but such a rule is unlikely ever to be announced. Ferrell, 1995 OK CR 54, ¶ 7, 902 P.2d at 1115; see Beard v. Banks, 542 U.S. 406, 417 (2004) (identifying Gideon v. Wainright, 372 U.S. 335 (1963) as the paradigmatic watershed rule, and likely the only one ever announced by the Supreme Court); Edwards v. Vannoy, 141 S.Ct. 1547, 1561 (2021) (acknowledging the "watershed" rule concept was moribund and would no longer be incorporated in Teague retroactivity analysis).

¶11 Like the Supreme Court, we have long adhered to the principle that the narrow purposes of collateral review, and the reliance, finality, and public safety interests in factually accurate convictions and just punishments, weigh strongly against the application of new procedural rules to convictions already final when the rule is announced. Applying new procedural rules to final convictions, after a trial or guilty plea and appellate review according to then-existing procedures, invites burdensome litigation and potential reversals unrelated to accurate verdicts, undermining the deterrent effect of the criminal law. Ferrell, 1995 OK CR 54, ¶¶ 6-7, 902 P.2d at 1114-15.

¶12 Just as Teague's doctrine of non-retroactivity "was an exercise of [the Supreme Court's] power to interpret the federal habeas statute," Danforth v. Minnesota, 552 U.S. 264, 278 (2008), we have barred state post-conviction relief on new procedural rules as part of our independent authority to interpret the remedial scope of state post-conviction statutes. Smith v. State, 1994 OK CR 46, ¶ 3, 878 P.2d 375, 377-78 (declining to apply rule on flight instruction to conviction that was final six years earlier); Thomas, 1994 OK CR 85, ¶ 13, 888 P.2d at 527 (declining to apply rule on filing bill of particulars at arraignment to conviction that was final when rule was announced).

¶13 Before and after McGirt, this Court has treated Indian Country claims as presenting non-waivable challenges to criminal subject matter jurisdiction. Bosse v. State, 2021 OK CR 3, ¶¶ 20-21, 484 P.3d 286, 293-94; Magnan v. State, 2009 OK CR 16, ¶ 9, 207 P.3d 397, 402 (both characterizing claim as subject matter jurisdictional challenge that may be raised at any time). After McGirt was decided, relying on this theory of non-waivability, this Court initially granted post-conviction relief and vacated several capital murder convictions, and at least one non-capital conviction (Jimcy McGirt's), that were final when McGirt was announced.3

¶14 We acted in those post-conviction cases without our attention ever having been drawn to the potential non-retroactivity of McGirt in light of the Court of Appeals' opinion in United States v. Cuch, 79 F.3d 987 (10th Cir. 1996), cert. denied, 519 U.S. 963 (1996) and cases discussed therein, which we find very persuasive in our analysis of the state law question today. See also, e.g., Schlomann v. Moseley, 457 F.2d 1223, 1227, 1230 (10th Cir. 1972) (finding Supreme Court's "newly announced jurisdictional rule" restricting courts-martial in O'Callahan v. Parker, 395 U.S. 258 (1969) had made a "clear break with the past;" retroactive application to void final convictions was not compelled by jurisdictional nature of O'Callahan; and O'Callahan would not be applied retroactively to void court-martial conviction that was final when O'Callahan was decided).

¶15 After careful examination of the reasoning in Cuch, as well as the arguments of counsel and amici curiae, we reaffirm our recognition of the Cherokee, Choctaw, and Chickasaw Reservations[4] in those earlier cases. However, exercising our independent state law authority to interpret the remedial scope of the state post-conviction statutes, we now hold that McGirt and our post-McGirt decisions recognizing these reservations shall not apply retroactively to void a conviction that was final when McGirt was decided. Any statements, holdings, or suggestions to the contrary in our previous cases are hereby overruled.

¶16 In United States v. Cuch, supra, the Tenth Circuit Court of Appeals held that the Supreme Court's Indian Country jurisdictional ruling in Hagen v. Utah, 510 U.S. 399 (1994) was not retroactive to convictions already final when Hagen was announced. In Hagen, the Supreme Court held that certain lands recognized as Indian Country by Ute Indian Tribe v. Utah, 773 F.2d 1087 (10th Cir.1985) (en banc) were not part of the Uintah Reservation; and that Utah, rather than the federal government, had subject matter jurisdiction over crimes committed in the area. Cuch, 79 F.3d at 988.

¶17 Cuch and Appawoo, defendants who pled guilty and were convicted of major crimes (sexual abuse and second degree murder respectively) in the federal courts of Utah, challenged their convictions in collateral motions to vacate pursuant to 28 U.S.C. § 2255. They argued the subject matter jurisdiction defect recognized in Hagen voided their federal convictions. Cuch, 79 F.3d at 989-90. The federal district court found Hagen was not retroactive to collateral attacks on final convictions under section 2255. Id. at 990. The Tenth Circuit affirmed.

¶18 The Court of Appeals noted that the Supreme Court had applied non-retroactivity principles to new rules that alter subject matter jurisdiction. Id. at 990 (citing Gosa v. Mayden, 413 U.S. 665 (1973)) (refusing to apply new jurisdictional limitation on military courts-martial retroactively to void final convictions). The policy of non-retroactivity was grounded in principles of finality of judgments and fundamental fairness: Hagen had been decided after the petitioners' convictions were final; it was not dictated by precedent; and the accuracy of the underlying convictions weighed against the disruption and costs of retroactivity. Id. at 991-92.

¶19 The Court of Appeals found non-retroactivity of the Hagen ruling upheld the principle of finality and foreclosed the harmful effects of retroactive application, including

the prospect that the invalidation of a final conviction could well mean that the guilty will go unpunished due to the impracticability of charging and retrying the defendant after a long interval of time. Wholesale invalidation of convictions rendered years ago could well mean that convicted persons would be freed without retrial, for witnesses no longer may be readily available, memories may have faded, records may be incomplete or missing, and physical evidence may have disappeared. Furthermore, retroactive application would surely visit substantial injustice and hardship upon those litigants who relied upon jurisdiction in the federal courts, particularly victims and witnesses who have relied on the judgments and the finality flowing therefrom. Retroactivity would also be unfair to law enforcement officials and prosecutors, not to mention the members of the public they represent, who relied in good faith on binding federal pronouncements to govern their prosecutorial decisions. Society must not be made to tolerate a result of that kind when there is no significant question concerning the accuracy of the process by which judgment was rendered.

79 F.3d at 991-92 (citing and quoting from Gosa, 413 U.S. at 685, and Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 88 (1982) (internal citations, quotation marks, brackets, and ellipses omitted)).

¶20 The Court of Appeals found that no questions of innocence arose from the jurisdictional flaw in the petitioners' convictions. Their conduct was criminal under both state and federal law. The question resolved in Hagen was simply "where these Indian defendants should have been tried for committing major crimes." 79 F.3d at 992 (emphasis in original). The petitioners did not allege unfairness in the processes by which they were found guilty. Id.

¶21 The Court of Appeals reasoned that a jurisdictional ruling like Hagen raised no fundamental questions about the basic truth-finding functions of the courts that tried and sentenced the defendants. Id. The legal processes resulting in those convictions had "produced an accurate picture of the conduct underlying the movants' criminal charges and provided adequate procedural safeguards for the accused." Id.

¶22 The Court of Appeals also noted that the chances of successful state prosecution were slim after so many years. "The evidence is stale and the witnesses are probably unavailable or their memories have dimmed." Id. at 993. The Court also considered the "violent and abusive nature" of the underlying convictions, and the burdens that immediate release of these prisoners would have on victims, many of whom were child victims of sexual abuse. Id.

¶23 The Court of Appeals distinguished two lines of Supreme Court holdings that retroactively invalidated final convictions. The first involved the conclusion that a court lacked authority to convict or punish a defendant in the first place. But in those cases, the bar to prosecution arose from a constitutional immunity against punishment for the conduct in any court, or prohibited a trial altogether. The defendants in Cuch could hardly claim immunity for acts of sexual abuse and murder. The only issue touched by Hagen was the federal court's exercise of jurisdiction. Id. at 993.

¶24 The second line of Supreme Court cases retroactively invalidating final convictions involved holdings that narrowed the scope of a penal statute defining elements of an offense, and thus invalidated convictions for acts that Congress had never criminalized. Hagen, on the other hand, had not narrowed the scope of liability for conduct under a statute, it had modified the extent of Indian Country jurisdiction, and thus altered the forum where crimes would be prosecuted. Id. at 994.

¶25 Finding neither of the exceptional circumstances that might warrant retroactive application of Hagen's jurisdictional ruling to final convictions, the Court of Appeals found "the circumstances surrounding these cases make prospective application of Hagen unquestionably appropriate in the present context." Id. Prior federal jurisdiction was well-established before Hagen; the convictions were factually accurate; the procedural safeguards and truth-finding functions of the courts were not impaired; and retroactive application would compromise both reliance and public safety interests that legitimately attached to prior proceedings.

¶26 We find Cuch's analysis and authorities persuasive as we consider the independent state law question of collateral non-retroactivity for McGirt. First, we conclude that McGirt announced a rule of criminal procedure, using prior case law, treaties, Acts of Congress, and the Major Crimes Act to recognize a long dormant (or many thought, non-existent) federal jurisdiction over major crimes committed by or against Indians in the Muscogee (Creek) Reservation. And like Hagen before it, "the [McGirt] decision effectively overruled the contrary conclusion reached in [the Murphy] case,[5] redefined the [Muscogee (Creek)] Reservation boundaries . . . and conclusively settled the question." Cuch, 79 F.3d at 989.

¶27 McGirt did not "alter[] the range of conduct or the class of persons that the law punishes" for committing crimes. Schriro v. Summerlin, 542 U.S. 348, 353 (2004). McGirt did not determine whether specific conduct is criminal, or whether a punishment for a class of persons is forbidden by their status. McGirt's recognition of an existing Muscogee (Creek) Reservation effectively decided which sovereign must prosecute major crimes committed by or against Indians within its boundaries, crimes which previously had been prosecuted in Oklahoma courts for more than a century. But this significant change to the extent of state and federal criminal jurisdiction affected "only the manner of determining the defendant's culpability." Schriro, 542 U.S. at 353 (emphasis in original). For purposes of our state law retroactivity analysis, McGirt's holding therefore imposed only procedural changes, and is clearly a procedural ruling.

¶28 Second, the procedural rule announced in McGirt was new.[6] For purposes of retroactivity analysis, a case announces a new rule when it breaks new ground, imposes a new obligation on the state or federal government, or in other words, the result was not dictated by precedent when the defendant's conviction became final. Ferrell, 1995 OK CR 54, ¶ 7, 902 P.2d at 1114 (finding rule of inadmissibility of certain evidence broke new ground and was not dictated by precedent when defendant's conviction became final).

¶29 McGirt imposed new and different obligations on the state and federal governments. Oklahoma's new obligations included the reversal on direct appeal of at least some major crimes convictions prosecuted (without jurisdictional objections at the time, and apparently lawfully) in these newly recognized parts of Indian Country; and to abstain from some future arrests, investigations, and prosecutions for major crimes there. The federal government, in turn, was newly obligated under McGirt to accept its jurisdiction over the apprehension and prosecution of major crimes by or against Indians in a vastly expanded Indian Country.

¶30 McGirt's procedural rule also broke new legal ground in the sense that it was not dictated by, and indeed, arguably involved controversial innovations upon, Supreme Court precedent. For today's purposes, the holding in McGirt was dictated by precedent only if its essential conclusion, i.e., the continued existence of the Muscogee (Creek) Reservation, was "apparent to all reasonable jurists" when Mr. Parish's conviction became final in 2014. Lambrix v. Singletary, 520 U.S. 518, 527-28 (1997).

¶31 In 2005, this Court had declined to recognize the claimed Muscogee (Creek) Reservation, and thus denied the essential premise of the claim on its merits, in Murphy v. State, 2005 OK CR 25, ¶¶ 50-52, 124 P.3d at 1207-08. From then until the Tenth Circuit Court of Appeals' 2017 decision in Murphy v. Royal, 866 F.2d 1164 (10th Cir. 2017), no court that had addressed the issue, including the federal district court that initially denied Murphy's habeas claim, had embraced the possibility that the old boundaries of the Muscogee (Creek) Nation remained a reservation.[7]

¶32 With no disrespect to the views that later commanded a Supreme Court majority in McGirt, the dissenting opinion of Chief Justice Roberts, joined by Justices Alito, Kavanaugh, and Thomas, whom we take to be "reasonable jurists" in the required sense, certainly did not view the holding in McGirt as dictated by precedent even in 2020, much less in 2014.[8] Chief Justice Roberts's dissent raised a host of reasonable doubts about the majority's adherence to precedent,[9] arguing at length that it had divined the existence of a reservation only by departing from the governing standards for proof of Congress's intent to disestablish one, McGirt, 140 S.Ct. at 2489; and in many other ways besides,[10] "disregarding the 'well settled' approach required by our precedents." Id. at 2482 (Roberts, C.J., dissenting). The McGirt majority, of course, remains just that, but the Chief Justice's reasoned, precedent-based objections are additional proof that McGirt's holding was not "apparent to all reasonable jurists" when Mr. Parish's conviction became final in 2014.

¶33 Third, our independent exercise of authority to impose remedial constraints under state law on the collateral impact of McGirt and post-McGirt litigation is consistent with both the text of the opinion and the Supreme Court's apparent intent. As already demonstrated, McGirt is neither a substantive rule nor a watershed rule of criminal procedure. The Supreme Court itself has not declared that McGirt is retroactive to convictions already final when the ruling was announced.

¶34 McGirt was never intended to annul decades of final convictions for crimes that might never be prosecuted in federal court; to free scores of convicted prisoners before their sentences were served; or to allow major crimes committed by, or against, Indians to go unpunished. The Supreme Court's intent, as we understand it, was to fairly and conclusively determine the claimed existence and geographic extent of the reservation.

¶35 The Supreme Court predicted that McGirt's disruptive potential to unsettle convictions ultimately would be limited by "other legal doctrines--procedural bars, res judicata, statutes of repose, and laches, to name a few," designed to "protect those who have reasonably labored under a mistaken understanding of the law." McGirt, 140 S.Ct. at 2481. The Court also well understood that collateral attacks on final state convictions based on McGirt would encounter "well-known state and federal limitations on post-conviction review in criminal proceedings." Id. at 2479. "[P]recisely because those doctrines exist," the Court said, it felt "free" to announce a momentous holding effectively recognizing a new jurisdiction and supplanting a longstanding previous one, "leaving questions about reliance interests for later proceedings crafted to account for them." Id. at 2481 (brackets and ellipses omitted).

¶36 Those questions are now properly before us and urgently demand our attention. Because McGirt's new jurisdictional holding was a clear break with the past, we have applied McGirt to reverse several convictions for major crimes pending on direct review, and not yet final, when McGirt was announced. The balance of competing interests is very different in a final conviction, and the reasons for non-retroactivity of a new jurisdictional rule apply with particular force. Non-retroactivity of McGirt in state post-conviction proceedings can mitigate some of the negative consequences so aptly described in Cuch, striking a proper balance between the public safety, finality, and reliance interests in settled convictions against the competing interests of those tried and sentenced under the prior jurisdictional rule.

¶37 The State's reliance and public safety interests in the results of a guilty plea or trial on the merits, and appellate review according to then-existing rules, are always substantial. Though Oklahoma's jurisdiction over major crimes in the newly recognized reservations was limited in McGirt and our post-McGirt reservation rulings, the State's jurisdiction was hardly open to doubt for over a century and often went wholly unchallenged, as it did at Mr. Parish's trial in 2012.

¶38 We cannot and will not ignore the disruptive and costly consequences that retroactive application of McGirt would now have: the shattered expectations of so many crime victims that the ordeal of prosecution would assure punishment of the offender; the trauma, expense, and uncertainty awaiting victims and witnesses in federal re-trials; the outright release of many major crime offenders due to the impracticability of new prosecutions; and the incalculable loss to agencies and officers who have reasonably labored for decades to apprehend, prosecute, defend, and punish those convicted of major crimes; all owing to a longstanding and widespread, but ultimately mistaken, understanding of law.

¶39 By comparison, Mr. Parish's legitimate interests in post-conviction relief for this jurisdictional error are minimal or non-existent. McGirt raises no serious questions about the truth-finding function of the state courts that tried Mr. Parish and so many others in latent contravention of the Major Crimes Act. The state court's faulty jurisdiction (unnoticed until many years later) did not affect the procedural protections Mr. Parish was afforded at trial. The trial produced an accurate picture of his criminal conduct; the conviction was affirmed on direct review; and the proceedings did not result in the wrongful conviction or punishment of an innocent person. A reversal of Mr. Parish's final conviction now undoubtedly would be a monumental victory for him, but it would not be justice.

¶40 Because we hold that McGirt and our post-McGirt reservation rulings shall not apply retroactively to void a final state conviction, the order vacating Mr. Parish's murder conviction was unauthorized by state law. The State ordinarily may file a regular appeal from an adverse post-conviction order, but here, it promptly petitioned this Court for extraordinary relief and obtained a stay of proceedings. The time for filing a regular post-conviction appeal (twenty days from the challenged order) has since expired. Rule 5.2(C), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2021).

¶41 The petitioner for a writ of prohibition must establish that a judicial officer has, or is about to, exercise unauthorized judicial power, causing injury for which there is no adequate remedy. Rule 10.6(A), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2021). There being no adequate remedy by appeal, the injury caused by the unauthorized dismissal of this final conviction justifies the exercise of extraordinary jurisdiction. The writ of prohibition is GRANTED. The order granting post-conviction relief is REVERSED.

OPINION BY: LEWIS, J.
ROWLAND, P.J.: CONCURS
HUDSON, V.P.J.: SPECIALLY CONCURS
LUMPKIN, J.: SPECIALLY CONCURS

FOOTNOTES

[1] Teague v. Lane, 489 U.S. 288, 295 (1989) (defining a final conviction as one where judgment was rendered, the availability of appeal exhausted, and the time to petition for certiorari had elapsed).

[2] The Cherokee, Chickasaw, Choctaw, and Muscogee (Creek) Nations filed a joint brief as amici curiae in response to our invitation. The Acting Attorney General of Oklahoma, counsel from the Capital Habeas Unit of the Federal Public Defender's Office for the Western District of Oklahoma, and the Oklahoma Criminal Defense Lawyer's Association also submitted briefs as amicus curiae. We thank counsel for their scholarship and vigorous advocacy. 

[3] Bosse, supra; Cole v. State, 2021 OK CR 10, __ P.3d __; Ryder v. State, 2021 OK CR 11, 489 P.3d 528, Bench v. State, 2021 OK CR 12, __ P.3d __. We later stayed the mandate in these capital post-conviction cases pending the State's petition for certiorari to the Supreme Court. We have also granted McGirt-based relief and vacated many convictions in appeals pending on direct review. E.g., Hogner v. State, 2021 OK CR 4, __ P.3d __; Spears v. State, 2021 OK CR 7, 485 P.3d 873; Sizemore v. State, supra.

[4] We first recognized the Seminole Reservation in the post-McGirt direct appeal of Grayson v. State, 2021 OK CR 8, 485 P.3d 250, and have no occasion to revisit that decision today.

[5] Murphy v. State, 2005 OK CR 25, 124 P.3d 1198 (denying post-conviction relief on claim that Muscogee (Creek) Reservation was Indian Country and jurisdiction of murder was federal under the Major Crimes Act).

[6] McGirt's recognition of the entire historic expanse of the Muscogee (Creek) Nation as a reservation was undoubtedly new in the temporal sense. We take it as now well-established that "Oklahoma exercised jurisdiction over all of the lands of the former Five [] Tribes based on longstanding caselaw from statehood until the Tenth Circuit in Indian Country, U.S.A. v. State of Oklahoma, 829 F.2d 967 (10th Cir.1987) found a small tract of tribally-owned treaty land existed along the Arkansas River in Tulsa County, Oklahoma." Murphy v. Sirmons, 497 F. Supp.2d 1257, 1288-89 (E.D. Okla. 2007). Until McGirt, this Court, and Oklahoma law enforcement officials generally, declined to recognize the historic boundaries of any Five Tribes reservation, as such, as Indian Country. See, e.g., 11 Okla. Op. Att'y. Gen. 345 (1979), available at 1979 WL 37653, at *8-9 (stating the Attorney General's opinion that "there is no 'Indian country' in said former 'Indian Territory' over which tribal and thus federal jurisdiction exists").

[7] McGirt, 140 S.Ct. at 2497 (Roberts, C.J., dissenting). In Murphy v. Sirmons, 497 F.Supp.2d 1257, 1289-90 (E.D. Okla. 2007), the federal habeas court held thus:

While the historical boundaries of once tribally owned land within Oklahoma may still be determinable today, there is no question, based on the history of the Creek Nation, that Indian reservations do not exist in Oklahoma. State laws have applied over the lands within the historical boundaries of the Creek nation for over a hundred years.

The federal district court found "no doubt the historic territory of the Creek Nation was disestablished as a part of the allotment process." Id., at 1290.  The court concluded that our 2005 decision "refusing to find the crime occurred on an Indian 'reservation' [was] not 'contrary to nor an unreasonable application of Federal law as determined by the United States Supreme Court.'" Id.

[8] The mere existence of a dissent does not establish that a rule is new, but a 5-4 split among Justices on whether precedent dictated a holding is strong evidence of a novel departure from precedent. Beard, 542 U.S. at 414-15 (finding that the four dissents in Mills v. Maryland strongly indicated that the rule announced was not dictated by Lockett v. Ohio).

[9] Principally Solem v. Bartlett, 465 U.S. 463 (1984), South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998), and Nebraska v. Parker, 577 U.S. 481 (2016).

[10] See generally, McGirt, 140 S.Ct. at 2485-2489 (Roberts, C.J., dissenting).

HUDSON, VICE PRESIDING JUDGE, SPECIALLY CONCUR:

¶1 I commend Judge Lewis for his thorough discussion of the retroactivity principles governing this case. I write separately to summarize my understanding of today's holding. Today's ruling holds that McGirt v. Oklahoma, 140 S. Ct. 2452 (2020) does not apply retroactively on collateral review to convictions that were final before McGirt. We apply on state law grounds the retroactivity principles from Teague v. Lane, 489 U.S. 288 (1989) in reaching this conclusion because the United States Supreme Court has not previously ruled on the retroactivity of McGirt. We hold that McGirt is a new rule of criminal procedure not dictated by precedent, that represents a clear break with past law and that imposes a new obligation on the State. The Supreme Court recently acknowledged there is no longer an exception in its Teague jurisprudence for watershed procedural rules to be applied retroactively and we incorporate this ruling in today's decision. See Edwards v. Vannoy, 141 S. Ct. 1547, 1561 (2021). Today's decision is also based on United States v. Cuch, 79 F.3d 987 (10th Cir. 1996) which addressed a similar situation. We overrule our previous decisions in which we have applied McGirt on post-conviction review. Today's decision, however, reaffirms our previous recognition of the existence of the various reservations in those cases.

¶2 Based on this understanding of our holding, I fully concur in today's decision. While this decision resolves one aspect of the post-McGirt jurisdictional puzzle, many challenges remain for which there are no easy answers. So far, Congress has missed the opportunity to implement a practical solution which, at this point, seems unlikely. It is now up to the leaders of the State of Oklahoma, the Tribes and the federal government to address the jurisdictional fallout from the McGirt decision. Only in this way, with all of these parties working together, can public safety be ensured across jurisdictional boundaries in the historic reservation lands of eastern Oklahoma. It will require this type of cooperation in the post-McGirt world to ensure that stability is restored to Oklahoma's criminal justice system.

LUMPKIN, JUDGE, SPECIALLY CONCURRING: 

¶1 I compliment my colleague on a well-researched opinion which accurately sets out the decisions of the U.S. Supreme Court and the Tenth Circuit Court of Appeals regarding giving retroactive effect to Supreme Court decisions. I especially compliment him for recognizing the scholarly analysis of Chief Justice Roberts in the McGirt dissent which shows by established precedent that the McGirt majority was not fully analyzing and applying past precedent of the Court in its decision.

¶2 I join this opinion based on the precedent set by the United States Supreme Court and the Tenth Circuit Court of Appeals. In doing so I cannot divert from basic principles of stating the obvious. In recognizing that the federal precedents set forth in the opinion and this writing are binding on this Court, I cannot overlook the legal fact that each of them applied a policy relating to collateral attacks on judgments rendered by courts lacking jurisdiction to render those judgments. When those courts found the lower courts rendering the subject judgments had no jurisdiction to render them, the result of this finding should have been to render the judgments void. Rather than declaring those judgments void, the courts instead formulated a policy limiting the retroactive application of their decisions, thereby preserving from collateral attack final judgments preceding them.

¶3 Keeping the policy decisions reflected in those opinions in mind, I do diverge from the court in labeling the McGirt ruling as procedural. When the federal government pre-empts a field of law, the legal effect is to deprive states of their jurisdiction in that area of the law. If a court lacks jurisdiction to act then any rulings and judgments would appear to be void when rendered.[1] As the opinion notes, this Court since statehood has recognized and honored federal jurisdiction as to Indian allotments and dependent Indian communities. Those areas are subject to federal jurisdiction and that jurisdiction is recognized by the federal government, the tribes and the State of Oklahoma. There was no question Oklahoma had jurisdiction over the rest of the state and this Court, as the court with exclusive jurisdiction in criminal cases, faithfully honored those jurisdictional claims.

¶4 Regardless, a 5-4 majority of the Supreme Court disregarded the precedent set out by Chief Justice Roberts in his dissent to McGirt, and for the first time in legal history determined the existence of a reservation in Oklahoma based on "magic words" rather than historical context.[2] In doing so, the majority in McGirt declared this reservation has always been in existence, even after Oklahoma became a state. This operative wording in the opinion creates a legal conundrum in that McGirt states that legally Oklahoma never had jurisdiction on this newly identified Indian reservation. This holding creates a question as to every criminal judgment entered by a state court regarding its validity. If all courts involved in this issue held themselves to the legal effect of this holding then those judgments would be void.

¶5 However both the Supreme Court and the Tenth Circuit have shown us by their precedents that courts have an option other than the legal one in cases of this type and that is the application of legal policy. As set out in the opinion, each of those courts has applied policy regarding retroactive application of cases based on the chaos, confusion, harm to victims, etc., if retroactive application occurred. The McGirt decision is the Hagen v. Utah, 510 U.S. 399 (1994), decision in reverse. In upholding the state court conviction, the Court held in Hagen that Congress had disestablished the Uintah reservation; therefore, the federal district court did not have jurisdiction to decide the subject case. In a later case involving the same land area, United States v. Cuch, 79 F.3d 987 (10th Cir. 1996), the Tenth Circuit found that although the federal district court lacked jurisdiction to try the subject cases, there was no need to vacate the judgments for lack of jurisdiction because of the harm it would cause and because those defendants were given a fair trial and made no complaints regarding the fairness. Thus the court applied policy rather than the law which would have rendered the judgments void due to lack of subject matter jurisdiction.

¶6 The legal effect of the McGirt decision, finding Oklahoma lacked jurisdiction to try cases by or against Indians in Indian Country due to federal preemption through the Major Crimes Act, would be to declare the associated judgments void. However, we now adopt the federal policy and established precedent of selective retroactive application in these type of cases due to the ramifications retroactive application would have on the criminal justice system and victims. This is hard to explain in an objective legal context but provides a just and pragmatic resolution to the McGirt dilemma.

FOOTNOTES

[1] I realize courts in the past have engaged in legal gymnastics to keep from voiding judgments rendered by a court without jurisdiction by finding that a court's judgment must be void on its face before it can be held void. Springer v. Townsend, 336 F.2d 397, 401 (10th Cir. 1964) (in deciding whether a probate decree was void, the Court stated "our scope of review is limited to determining whether a lack of jurisdiction in the approval proceeding affirmatively appears from the record."; "[a] judgment will not be held to be void on its face unless an inspection will affirmatively disclose that the court had no jurisdiction of the person, no jurisdiction of the subject matter, or had no judicial power to render the particular judgment." Clay v. Sun River Mining Co., 302 F.2d 599, 601 (10th Cir. 1962); "[a]s long as the supporting record does not reflect the district court's lack of authority, the district court order cannot be declared "void." Such an order is instead only "voidable." Bumpus v. State, 1996 OK CR 52, ¶ 7, 925 P.2d 1208, 1210; "[t]his Court has held in numerous cases that in order for a judgment to be void as provided in the Statute just quoted, it must be void on the face of the record, and that extrinsic evidence is not admissible to show judgment is void on the face of the record." Scoufos v. Fuller, 1954 OK 363, 280 P.2d 720, 723. However, logic and common sense dictate that if a court had no authority to act then any actions would be a nullity. Regardless, I apply the precedent cited in the opinion and specially concur.

[2] In Solem v. Bartlett, 465 U.S. 463 (1984), the Court enunciated several factors which must be considered in determining whether a reservation has been disestablished. Those factors are: the explicit language of Congress evincing intent to change boundaries; events surrounding the passage of surplus land acts which "reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation . . ."; Congress's subsequent treatment of the subject areas; identity of who moved onto the affected land; and the subsequent demographic history of those lands. Id. at 470-72.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 

Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2021 OK CR 23, 495 P.3d 669, BOSSE v. STATE
Cited
 2021 OK CR 24, 495 P.3d 670, BENCH v. STATE
Cited
 2021 OK CR 25, 495 P.3d 669, RYDER v. STATE
Cited
 2021 OK CR 26, 495 P.3d 670, COLE v. STATE
Cited
 2021 OK CR 27, ROTH v. STATE
Discussed
 2021 OK CR 28, COLE v. STATE
Cited
 2021 OK CR 30, BOSSE v. STATE
Discussed
 2021 OK CR 36, RYDER v. STATE
Discussed at Length
 2021 OK CR 38, MCCLAIN v. STATE
Cited


 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 
 1962 10CIR 33, 302 F.2d 599, Clay v. Sun River Min. Co.
Cited
 1964 10CIR 181, 336 F.2d 397, Springer v. Townsend
Cited
 1972 10CIR 98, 457 F.2d 1223, Schlomann v. Moseley
Cited
 1985 10CIR 244, 773 F.2d 1087, Ute Indian Tribe v. State of Utah
Cited
 1987 10CIR 255, 829 F.2d 967, Indian Country, U.S.A., Inc. v. State of Okl. ex rel. Oklahoma Tax Com'n
Cited
 1996 10CIR 414, 79 F.3d 987, U.S. v. Cuch
Discussed at Length
 2002 10CIR 58, 278 F.3d 1136, BURLESON v. SAFFLE
Cited
Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1994 OK CR 46, 878 P.2d 375, SMITH v. STATE
Discussed
 1994 OK CR 85, 888 P.2d 522, THOMAS v. STATE
Discussed
 1995 OK CR 54, 902 P.2d 1113, FERRELL v. STATE
Discussed at Length
 1996 OK CR 52, 925 P.2d 1208, Bumpus v. State
Discussed
 2003 OK CR 16, 74 P.3d 601, PICKENS v. STATE
Discussed
 2005 OK CR 25, 124 P.3d 1198, MURPHY v. STATE
Discussed at Length
 2006 OK CR 6, 130 P.3d 273, ANDERSON v. STATE
Discussed
 2006 OK CR 42, 147 P.3d 243, CARTER v. STATE
Discussed
 2009 OK CR 16, 207 P.3d 397, MAGNAN v. STATE
Discussed
 2010 OK CR 20, 238 P.3d 934, BAXTER v. STATE
Discussed
 2021 OK CR 3, 484 P.3d 286, WITHDRAWN
Discussed
 2021 OK CR 4, HOGNER v. STATE
Cited
 2021 OK CR 6, 485 P.3d 867, SIZEMORE v. STATE
Discussed
 2021 OK CR 7, 485 P.3d 873, SPEARS v. STATE
Discussed
 2021 OK CR 8, 485 P.3d 250, GRAYSON v. STATE
Discussed
 2021 OK CR 10, 492 P.3d 11, WITHDRAWN
Cited
 2021 OK CR 11, 489 P.3d 528, WITHDRAWN
Cited
 2021 OK CR 12, 492 P.3d 19, WITHDRAWN
Cited
 2021 OK CR 15, STATE ex rel. DISTRICT ATTORNEY v. WALLACE
Cited
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1954 OK 363, 280 P.2d 720, SCOUFOS v. FULLER
Discussed


 
 








 
 
 
 

 
 




 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA