FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 4, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PAUL CURTIS PEMBERTON,

    Defendant - Appellant.

No. 22-7028

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:21-CR-0012-JFH-1)**
_____

Timothy C. Kingston, Law Office of Tim Kingston, Foley, Alabama (Paul T. Lund, Burleson, Pate & Gibson, Dallas, Texas, with him on the briefs), for Defendant-Appellant.

James R.W. Braun, Special Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with him on the brief), United States Attorney's Office, Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **TYMKOVICH**, **BRISCOE**, and **MORITZ**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

This appeal requires that we consider the ongoing ramifications of the United States Supreme Court's decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020).  In that case, the Court ruled that the Muscogee (Creek) Nation Reservation covered a

larger area of eastern Oklahoma than previously acknowledged by both the state and federal governments. As a result, many crimes that had been committed in what was previously believed to be *outside* of tribal jurisdictions were actually committed *within* tribal jurisdictions—meaning that for many decades state criminal cases were prosecuted in the wrong jurisdiction.

Paul Pemberton falls within this class of defendants. In 2004, he was convicted of a murder committed in McIntosh County, Oklahoma. Following the *McGirt* decision and related decisions in Oklahoma, McIntosh County has been determined to straddle the Creek Nation and the Cherokee Nation reservations. As we explain in greater detail below, the murder, certain parts of the investigation, and Mr. Pemberton's arrest occurred within these reservations. And Mr. Pemberton was prosecuted and convicted for the murder in an Oklahoma state court. The problem arises because the Major Crimes Act confers exclusive federal jurisdiction over any Indian who commits murder within Indian country. 18 U.S.C. § 1153. This implies that the federal government should have investigated the crime, and Mr. Pemberton should have been prosecuted in federal court.

After the *McGirt* decision in 2020 confirmed that longstanding assumptions about the scope of reservation boundaries were incorrect, many state inmates who are enrolled members of Indian tribes sought to challenge their convictions. Mr. Pemberton, an enrolled member of the Creek Nation, chose to do so. He applied for post-conviction relief in Oklahoma state court, contending that his conviction was invalid. Mr. Pemberton argued that the State of Oklahoma lacked jurisdiction over

2

the crime since it occurred in Indian Country and because he was an enrolled member of the Creek Nation at the time. [1]

The Oklahoma state court denied Mr. Pemberton's request to void his final state conviction, relying largely on the Oklahoma Court of Criminal Appeals' holding in *State ex rel. Matloff v. Wallace,* 2021 OK CR 21, 497 P.3d 686. *See Pemberton v. Oklahoma*, CF-2004-57, Doc. #CC21110300000018 (Dist. Ct., McIntosh Cnty. Nov. 3, 2021).[2] The Oklahoma Court of Criminal Appeals affirmed that denial. *See Pemberton v. Oklahoma*, No. PC-2021-1396 (Okla. Crim. App. 2022).[3]

---

[1]  Mr. Pemberton's application for post-conviction relief was filed on July 8, 2020—a day before the Supreme Court decided *McGirt* on July 9, 2020. *See* Application for Post-Conviction Relief Part A (Doc. #CC20070900000025).  On July 27, 2020, he requested the Oklahoma state court to take judicial notice of the law and adjudicative facts of *McGirt*.  *See* Petitioner's Motion for the Court to Take Judicial Notice of New Authority. (Doc. #CC20072700000399).  As stated, the Oklahoma state court ultimately denied Mr. Pemberton's application on November 3, 2021, *see Pemberton v. Oklahoma*, CF-2004-57, Doc. #CC21110300000018 (Dist. Ct., McIntosh Cnty. Nov. 3, 2021), and the Oklahoma Court of Criminal Appeals affirmed.  *See Pemberton v. Oklahoma*, No. PC-2021-1396 (Okla. Crim. App. 2022) (unpublished).

[2]  The *Matloff* court concluded that *McGirt* announced a new procedural rule, but it declined to apply that newly-created procedural rule retroactively to void state convictions that were final before *McGirt*.  *See State ex rel. Matloff v. Wallace*, 2021 OK CR 21, ¶ 40, 497 P.3d 686, 688.

[3]  On August 16, 2022, Mr. Pemberton moved to extend the time to petition for a writ of certiorari from September 1, 2022, to October 31, 2022.  *See* Petitioner's Motion for Extension of Time to File Petition for Certiorari, *Paul Curtis Pemberton, Applicant v. Oklahoma*, No. 22-A168.  Justice Gorsuch granted the motion, extending Mr. Pemberton's time to petition for a writ of certiorari until October 31, 2022.  To date, however, Mr. Pemberton does not appear to have petitioned the Supreme Court for a writ of certiorari.

As state habeas proceedings were pending, a federal grand jury indicted Mr. Pemberton for the 2004 murder—perhaps a proactive measure in anticipation of the post-*McGirt* jurisdictional vulnerabilities. R. Vol. 1 at 15-16. Before the federal trial court, Mr. Pemberton moved to suppress all evidence gathered and statements obtained during the 2004 state investigation. R. Vol. 1 at 41. He argued that "neither McIntosh County nor the state of Oklahoma had jurisdiction to investigate, arrest or interrogate Indian persons on Indian Country" because "under the Major Crimes Act, the federal government had exclusive jurisdiction over [the] crime." R. Vol. 1 at 45.

The district court denied Mr. Pemberton's suppression motion, and a federal jury convicted him on all counts. At sentencing, Mr. Pemberton asked to proceed without a lawyer—a right protected by the Sixth Amendment. The district court denied that request, allowing appointed counsel to continue to represent Mr. Pemberton throughout the sentencing phase.

Mr. Pemberton appeals both denials. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. We conclude that state investigatory officers acted consistently with the prevailing factual and legal landscape at the time, and thus acted in good faith. The district court did not err in declining to suppress the evidence developed in the investigation. We also conclude the district court did not err by allowing appointed counsel to represent Mr. Pemberton in the sentencing proceedings.

## I. Background

We start with Mr. Pemberton's arrest in 2004.

Donald Pemberton called 911, stating that his son—Paul Curtis Pemberton—shot his wife—DeAnna Pemberton—at their home in Checotah, Oklahoma. Dispatch contacted McIntosh County Deputy Dewayne Hall, and Deputy Hall drove to the residence in his personal truck. R. Vol. 1 at 137. Deputy Hall was the first law enforcement officer to arrive at the scene. *Id*. Upon arrival, Deputy Hall noticed Mr. Pemberton sitting atop a truck's tailgate. Deputy Hall exited his patrol car, drew his weapon, and ordered Mr. Pemberton to the ground. After that, Deputy Hall handcuffed Mr. Pemberton and searched him. *Id*. Three Checotah Police Department deputies and McIntosh County Sheriff's Office deputies arrived next on the scene. R. Vol. 1 at 62; R. Vol. 2 at 904.

McIntosh County Sheriff Jeff Coleman, who lived three miles down the road, responded next. R. Vol. 1 at 280. Once he arrived, he approached an already handcuffed Mr. Pemberton, who was lying face down on the ground. As Sherriff Coleman drew near, Mr. Pemberton looked up at him and said that the victim—his stepmother, DeAnna—"drove [him] crazy" and that he "w[ould] not talk to anyone but [Sheriff Coleman]." R. Vol. 1 at 74. Sheriff Coleman then escorted Mr. Pemberton to his patrol car and read him his *Miranda* warning. *Id*. Sheriff Coleman asked Mr. Pemberton whether he understood each right, and Mr. Pemberton acknowledged that he did. *Id*. Mr. Pemberton then admitted to the murder and was transported to McIntosh County jail—located within the Muscogee (Creek) Nation Reservation. R. Vol. 1 at 231

5

Once at the county jail, Oklahoma State Bureau of Investigation (OSBI) agent John Jones interviewed Mr. Pemberton—who again confessed to shooting his stepmother. Later, an Oklahoma state judge authorized a warrant to search Mr. Pemberton's truck parked outside the Pemberton home. State officials executed the warrant, finding in Mr. Pemberton's truck .22 caliber ammunition and a Wal-Mart receipt for ammunition. Mr. Pemberton was later charged with first-degree murder and possessing a firearm as a felon. A jury found him guilty on both counts, and he was sentenced to life without parole.

He challenges his federal conviction and sentencing on direct appeal.

## II. Discussion

Mr. Pemberton argues that the district court made two distinct errors at two different stages of his federal case. First, he contends the district court erred at trial by declining to suppress the evidence obtained during the 2004 investigation into the murder. Second, he contends the district court erred at sentencing by denying him the constitutional right to represent himself.

We discuss each in turn.

### A.    *Suppression of Evidence*

Mr. Pemberton first argues that McIntosh County law enforcement lacked jurisdiction to investigate the crime, arrest him, or interrogate him because he was an enrolled tribal member on what *McGirt* subsequently determined to be a reservation. As a result, the district court should have suppressed all evidence flowing from his arrest, interrogation, and property searches. The district court rejected Mr.

6

Pemberton's suppression arguments, applying the good-faith exception to the search warrant, arrest, and investigation to prevent the application of the Fourth Amendment's exclusionary remedy. That brings us to *McGirt*. It is undisputed that Mr. Pemberton's crime, arrest, and investigation occurred on what has retroactively been determined to be outside Oklahoma's jurisdiction. The question, therefore, is whether the officers were objectively reasonable in believing that they had jurisdiction. Historical context informs that inquiry.

While recognized now under *McGirt* as legally erroneous, Oklahoma state courts have "entertained prosecutions for major crimes by Indians on Indian allotments"—including in McIntosh County—"for decades[.]" *McGirt*, 140 S. Ct. at 2470–71. As the Oklahoma Supreme Court put it long ago, "Congress had not intended to 'except out of [Oklahoma] an Indian reservation.'" *Id*. at 2497 (Roberts, C.J., dissenting) (quoting *Higgins v. Brown*, 20 Okla. 355, 419 (1908)). Indeed, "at statehood, Oklahoma immediately began prosecuting serious crimes committed by Indians in the new state courts, *and the federal government immediately ceased prosecuting such crimes in federal court*." *Id*. at 2496 (emphasis added).

But more than a century later, the Oklahoma Supreme Court's articulation of state court jurisdiction proved incorrect. On July 9, 2020, the Supreme Court decided *McGirt v. Oklahoma*, holding that—contrary to decades-long understanding and prevailing practice—Congress *did* except the Creek Reservation out of Oklahoma. *See McGirt*, 140 S. Ct. at 2482; *contra Higgins v. Brown*, 20 Okla. 355 at 419. Having done so, and because Congress never properly disestablished the Creek

7

Nation's reservation, much of eastern Oklahoma had been, and remained, Indian country. This misunderstanding implicated many parts of Oklahoma, including portions of the Cherokee Nation in McIntosh County where the murder here occurred.[4]

Perhaps recognizing the potential jurisdictional problem with Mr. Pemberton's state court conviction, a federal grand jury indicted him on February 23, 2021, for the same crimes—this time in federal court. At trial, federal prosecutors relied on the same evidence developed in 2004 by state law enforcement officers.

### 1. *Legal Framework—Good Faith*

The government all but concedes that *McGirt* settled the question of whether McIntosh County officers and OSBI agents acted outside of their jurisdiction. Accordingly, we deal only with the appropriate remedy to be applied to that "concededly unconstitutional" police conduct. *United States v. Leon*, 468 U.S. 897, 915 n.13 (1984).

To remedy Fourth Amendment violations, federal courts ordinarily invoke and apply the exclusionary rule, precluding the government from introducing at trial unlawfully seized evidence. *See United States v. Herrera*, 444 F.3d 1238, 1248 (10th

---

[4] The *McGirt* holding applied only to the Creek Reservation. *See McGirt*,140 S. Ct. at 2459. But during oral argument, Mr. Pemberton's counsel conceded that the reasoning in *McGirt* applied equally to the Cherokee Nation lands at issue in this case. And Oklahoma has since applied the reasoning in *McGirt* to the Cherokee Reservation. *See Hogner v. State*, 500 P.3d 629, 635 (Okla. Crim. App. 2021) (applying *McGirt* to the Cherokee Reservation and holding that the Cherokee Reservation has never been disestablished and remains Indian Country), *overruled on other grounds by Deo v. Par.*, 2023 OK CR 20, ¶ 18.

Cir. 2006). Yet a Fourth Amendment violation does not automatically require the application of the exclusionary rule; indeed, applying the exclusionary rule may not always be the appropriate remedy for a Fourth Amendment violation in a particular case. *See Leon*, 468 U.S. at 906-07 ("[W]hether the exclusionary sanction is appropriately imposed in a particular case" is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.") (citation omitted). Because "the exclusionary rule is designed to deter police misconduct," *id*. at 918, the appropriateness of applying the exclusionary rule "turns to a great extent on whose mistake produces the Fourth Amendment violation." *Herrera*, 444 F.3d. at 1250.

It follows that applying the rule "must alter" either the "behaviors of individual law enforcement officers" or "the policies of their departments" responsible for the misconduct. *Leon*, 468 U.S. at 918. *See also Arizona v. Evans*, 514 U.S. 1, 10 (1995) (noting that exclusionary rule safeguards against future violations of Fourth Amendment rights through its "general deterrent effect"). It similarly follows that exclusion "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id*. at 919; *Herrera*, 444 F.3d at 1249 ("We will ordinarily not deter, nor do we want to deter, objectively reasonable police conduct."). Thus, courts should not exclude evidence where an officer conducting "objectively reasonable law enforcement activity," *Leon*, 468 U.S. at 918, "relies, in an objectively reasonable manner, on a mistake made by someone other than the officer." *Herrera*, 444 F.3d at 1249. Absent evidence of "deliberate,

9

reckless, or grossly negligent disregard for Fourth Amendment rights," *Davis*, 564 U.S. at 256-57, the deterrence rationale of the exclusionary rule no longer applies. In those situations, officers act with an "objectively reasonable good-faith belief that their conduct is lawful," *Davis*, 564 U.S. at 257, precluding the application of the exclusionary remedy. *See, e.g., Leon*, 468 U.S. 897 (1984) (magistrate's legal error); *Illinois v. Krull*, 480 U.S. 340 (1987) (legislature's unconstitutional law); *Arizona v. Evans*, 514 U.S. 1 (1995) (county clerk's erroneous computer record); *Davis v. United States*, 564 U.S. 229 (2011) (appellate judges' legal error).

Keeping these principles in mind, we evaluate both the search warrant and the arrest.

### a. The Search Warrant

Mr. Pemberton argues that McIntosh County officers unreasonably obtained a search warrant from a state court judge who had no jurisdiction to issue the search warrant in the first place. The question is whether we can attribute the jurisdictionally invalid warrant to the officers' mistakes or solely the state court judge's legal error. We hold the latter.

*Leon* generally requires we presume officers acted in good-faith reliance on a "warrant issued by a magistrate." *United States v. Pacheco*, 884 F.3d 1031, 1045 (10th Cir. 2018). Indeed, the *Leon* exception may apply even if the judge had "exceeded geographic constraints in issuing the warrant," *United States v. Workman*, 863 F.3d 1313, 1318 (10th Cir. 2017), because penalizing police officers for a judge's error, rather than police errors, "cannot logically contribute to the deterrence

of Fourth Amendment violations." *See Leon*, 468 U.S. at 921. Of course, courts may properly suppress evidence acquired in violation of the Fourth Amendment where "good faith is absent." *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985). But good faith is absent "only when an officer's reliance on that warrant is '*wholly unwarranted*.'" *Pacheco*, 884 F.3d at 1045 (emphasis added).

Here, the record does not support a conclusion that well-trained officers in McIntosh County "could not have harbored an objectively reasonable belief" in their ability to seek a warrant, or "could not have harbored an objectively reasonable belief" in the warrant's jurisdictional validity. *Leon*, 468 U.S. at 926.[5] As chronicled by Chief Justice Roberts in his dissenting opinion, the historical record provides evidence that government officials from the Creek, the State of Oklahoma, and the United States held and expressed the belief that the Creek reservation did not continue to exist after Oklahoma became a state. *McGirt*, 140 S. Ct. at 2502. Even though Congress never "terminat[ed]" the Creek Nation's reservation as a condition of statehood in 1907, *see McGirt*, 140 S. Ct. at 2464, it did eliminate the tribal courts in Creek Nation in 1898, *id.* at 2465 (citing Curtis Act of 1898, § 28, 30 Stat. 504–505), and "transferred all pending civil and criminal cases" to the federal government. *Id.*; *see United States v. Sands*, 968 F.2d 1058, 1061 (10th Cir. 1992) ("The [federal] government contends that criminal jurisdiction was conferred on Oklahoma in 1906 when cases of a local nature arising in Indian Territory were

---

[5] Oklahoma judges "must issue a search warrant" if "satisfied of the existence of grounds of the application." Okla. Stat. tit. 22 § 1225(A).

transferred to the State and the laws of Oklahoma were extended to Indian Territory."). At Oklahoma's statehood, "the federal government immediately ceased prosecuting [serious crimes committed by Indians] in federal court." *Id*. at 2496 (Roberts, C.J., dissenting). And Oklahoma immediately began prosecuting those crimes in state court. *Id*. at 2496-97 (collecting cases).[6]

Under the objective circumstances presented to the officers, they "act[ed] with an objectively reasonable good-faith belief that their conduct [was] lawful." *Workman*, 863 F.3d at 1317 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). Accordingly, after their objectively reasonable choice to apply for a warrant issued by a state court judge, the police officers could reasonably rely on the judge's authority to issue the warrant.[7] Because officers acted with an "objectively reasonable good-faith belief" in their "objectively reasonable law enforcement activity," *Leon*, 486 U.S. at 919, any resulting evidence was properly introduced at trial and should not have been excluded.

Mr. Pemberton attempts to rebut this conclusion, pointing to our decision in *United States v. Krueger*, 809 F.3d 1109 (10th Cir. 2015). In that case, we affirmed a

---

[6] In fact, the McIntosh County Sheriff's Department itself is located within the Creek Nation's Reservation. *See* R. Vol. 1 at 231.

[7] It would have been strange—if not objectively *unreasonable*—for police officers in McIntosh County to assume they lacked jurisdiction in the area they had been policing for a century. After all, the McIntosh County Sheriff's Department is located within the Creek Nation's Reservation—in McIntosh County. It is unclear why, sixteen years before the *McGirt* ruling, McIntosh County police officers would not have been considered derelict in their duty to McIntosh County residents if they failed to assist McIntosh County residents when requested.

12

defendant's motion to suppress evidence obtained via a search warrant issued in Kansas to search for and seize property in Oklahoma. But *Krueger* is readily distinguishable. There, we concluded the issuing judge "clearly lacked ... authority" to issue that warrant" because Rule 41 clearly prohibits a Kansas magistrate judge from issuing a warrant to search and seize property or persons in Oklahoma. *Id.* at 1116*; see* Fed. R. Crim. P. 41. (authorizing magistrates to issue warrants only to search for and seize a person or property located within the district). That the officers, in seeking and obtaining the warrant, were conducting what was otherwise "objectively reasonable law enforcement activity," *Leon*, 468 U.S. at 918, did not exonerate them from failing to comply with Rule 41 in the first instance: Rule 41 clearly and obviously prohibited the magistrate judge from issuing the warrant. *See Krueger*, 809 F.3d at 1116-17. Suppression, therefore, furthered the purpose of the exclusionary rule by deterring law enforcement officers from seeking and obtaining warrants "clearly violat[ing]" Rule 41's "clear and obvious" command. *Id*.

But that rationale would not apply here. McIntosh County officers did not seek and execute a state warrant "in the face of clearly established law recognizing that such a warrant would be beyond the jurisdiction of the state court." *United States v. Baker*, 894 F.2d 1144, 1149-50 (10th Cir. 1990). *McGirt* did not come along for sixteen more years. *See also State of Okla. ex rel. Oklahoma Tax Comm'n*, 829 F.2d 967, 975 (10th Cir. 1987) (declining to "decide whether the exterior boundaries of the 1866 Creek Nation have been disestablished" and "express[ing] no opinion regarding jurisdiction on allotted Creek lands or on other lands located

13

within the 1866 reservation boundaries."); *accord Murphy v. State*, 2005 OK CR 25, ¶¶ 51-52, 124 P.3d 1198, 1207-08 ("[T]he Tenth Circuit declined to answer the question of whether the exterior boundaries of the 1866 Creek Nation have been disestablished and expressly refused to express an opinion in that regard concerning allotted Creek lands.  If the federal courts remain undecided on this particular issue, we refuse to step in and make such a finding here.") (citing *Indian Country, U.S.A., Inc. v. State of Oklahoma*, 829 F.2d at 975 n. 3, 980 n. 5.).  In light of Oklahoma's history, nothing suggests the officers should have known that the Major Crimes Act clearly prohibited a judge in McIntosh County from issuing a warrant to search and seize property located in McIntosh County.

Yet Mr. Pemberton contends that a well-trained McIntosh County police officer should have known that the law surrounding Native American reservations was "clearly established."  Aplt. Br. at 13.  He argues that a well-trained McIntosh County police officer would have been "aware of [the] test" articulated in *Solem v. Bartlett* for determining whether a Native American reservation had been disestablished.  Aplt. Br. at 12. (citing 465 U.S. 463 (1984)).  Mr. Pemberton asserts that after unilaterally applying that test, an McIntosh County police officer would have concluded that "he had no ability to operate within the confines of an established Native American reservation like the one at issue here." Aplt. Br. at 12.

This argument defeats itself.  True, the Supreme Court had established the *Solem* test.  But determining whether Native American reservations, like the ones here, had been disestablished was neither entirely obvious nor necessarily deducible.

14

It certainly was not as straightforward as determining that the magistrate judge in *Krueger* lacked jurisdiction under Fed. R. Crim. P. 41. To be clear, the *Solem* test considers "statutory language" paramount, but it also considers "events surrounding the passage of a surplus land act." *Solem v. Bartlett*, 465 U.S. 463, 471 (1984). When those events "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation," the Supreme Court permits an inference that "Congress shared the understanding that its action would diminish the reservation, *notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged.*" *Id.* (emphasis added). Mr. Pemberton does not provide a convincing argument to support why the police officers applying this test in 2004 could reach only one determination: that "unbeknownst to anyone for the past century, a huge swathe of Oklahoma is actually a Creek Indian reservation, on which the State may not prosecute serious crimes committed by Indians like [Mr. Pemberton]." *McGirt*, 140 S. Ct. at 2482 (Roberts, C.J., dissenting). Instead, his argument relies on the fact that the Supreme Court in 2020 did not issue a 5-4 decision in the opposite direction.

In sum, the good faith exception to the exclusionary rule applies to the evidence discovered pursuant to the search warrant.

15

### b.  The Warrantless Arrest

For similar reasons, Mr. Pemberton's argument to suppress evidence obtained from the warrantless arrest also fails.

Mr. Pemberton asks us to reject this proposition since we have not applied the good-faith exception in the context of a warrantless arrest.  To be sure, we have determined that the good-faith exception to the exclusionary rule "generally applies only narrowly outside the context of a warrant."  *Herrera*, 444 F.3d at 1251.  And we recently recognized in our decision in *United States v. Patterson*, that this Circuit "has not squarely addressed" whether "the good-faith exception should apply to evidence collected from a warrantless arrest."  No. 21-7053, 2022 WL 17685602, at *8 (10th Cir. Dec. 15, 2022) (unpublished).

But we see no reason not to extend the good-faith exception to the warrantless arrest here.  This is especially true in this unique situation, where: (1) the police and prosecutorial practices were consistent with the state's traditional exercise of jurisdictional authority, thus providing an objectively reasonable basis to conclude that state officials reasonably believed that they acted within the boundaries of the law; (2) there was no clear legal precedent from the Supreme Court or the Tenth Circuit expressly contradicting the presumption of legitimacy of those practices; and (3) applying the good-faith exception does not undermine the deterrence principles underlying the exclusionary rule.  Moreover, "[i]n the context of warrantless arrests, the Fourth Amendment requires only that the arresting officers have probable cause

16

to believe that the person to be arrested has committed a crime and that the arresting officers make the arrest within their jurisdiction or under exigent circumstances." *United States v. Green*, 178 F.3d 1099, 1107 (10th Cir. 1999) (internal citations omitted). Because it is uncontested that the officers had probable cause to believe that Mr. Pemberton committed murder, and the officers acted with an objectively reasonable good-faith belief that they lawfully exercised jurisdiction over that felony, suppression is unwarranted.

Resisting this conclusion, Mr. Pemberton points to our opinion in *Ross v. Neff,* 905 F.2d 1349 (10th Cir. 1990) which, according to Mr. Pemberton, clearly established both that officers could not make a warrantless arrest outside of their jurisdiction and that Oklahoma law enforcement knew their jurisdiction did not extend to tribal lands.

In *Ross*, we recognized that a "warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause" and is therefore "presumptively unreasonable" absent "exigent circumstances." 905 F.2d at 1354. But we subsequently limited *Ross* "no further than the unique factual circumstances that spawned it: that is, a warrantless arrest by state police on federal tribal land." *United States v. Jones*, 701 F.3d 1300, 1312

(10th Cir. 2012). Despite appearing to be implicated based on these facts, *Ross* is inapplicable here for at least two reasons.[8]

*First*, we have declined to read *Ross* to require us to presume that a Fourth Amendment violation occurred just because one sovereign operated within the

---

[8] *Ross* is a qualified immunity case and is distinguishable for reasons unfavorable to Mr. Pemberton. A comparison of the tribal *trust* lands at issue in Adair County to those in McIntosh County sufficiently explains the differences. In *Ross*, a lone Adair County Sheriff's Department police officer sought to make an arrest for public intoxication at a park located on Cherokee Indian Tribal Trust land in Adair County, Oklahoma. *See* 905 F.2d at 1351-52. That land was "under a five-year lease," which had been "approved by the local office of the Bureau of Indian Affairs, to the South Greasy Community Park Association." *Id*. at 1351. We recognized that "Indian country is subject to exclusive federal or tribal criminal jurisdiction except as otherwise expressly provided by law" but that "no such provision has been made for Oklahoma." *Id*. 1352. From there, we concluded that "Oklahoma [had] neither received by express grant nor acted pursuant to congressional authorization to assume criminal jurisdiction over this Indian country, Adair County[.]" *Id*. Thus, a violation occurred.

Interestingly enough—and most relevant here—even in *Ross* we held that as a matter of law "a reasonable county officer, executing the law at the time," "would not have known that he was prohibited from making an arrest in the Greasy Ballpark" because "[b]road language in Supreme Court opinions" "gave the appearance of allowing state intervention when it was determined that such intervention would not compromise tribal or federal interests." *Ross*, 905 F.2d at 1354.

We see no reason why the jurisdictional mistake made here cannot be deemed objectively reasonable under the same rationale articulated in *Ross*. Consider the circumstances. The 1980s five-year lease that *established* Cherokee Indian Tribal Trust land explicitly instituted federal jurisdiction over the area in Adair County. At that point, the Major Crimes Act would have clearly precluded Oklahoma from exercising criminal jurisdiction over that area. But "the appearance of allowing state intervention" under certain situations made the mistaken state intervention a reasonable one. Here, McIntosh County's Indian allotments were believed for over a century to be *disestablished* as a condition of Oklahoma's statehood and, therefore, not subject to the Major Crimes Act at any point.

jurisdiction of another sovereign's territory.  *See, e.g.*, *Jones*, 701 F.3d at 1312
(rejecting argument that Missouri officers automatically violated the Fourth
Amendment by unknowingly traveling into Kansas and, without securing the proper
authority to operate within Kansas, conducting an unauthorized criminal
investigation there).  Even if *Ross* controlled, it does not compel the per se result Mr.
Pemberton seeks.

　　*Second*, a Supreme Court decision after *McGirt* confirms that the mere fact
that McIntosh officers and OSBI operated without jurisdiction in Indian lands does
not preclude the good-faith exception—much less require the exclusionary rule.
"[A]s a matter of state sovereignty, a State has jurisdiction over all of its territory,
including Indian country."  *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022).
Indeed, "the Constitution allows a State to exercise jurisdiction in Indian country"
because "Indian country is part of the State, not separate from the State."  *Id*.  As
discussed above, whether federal law—the Major Crimes Act—preempted
Oklahoma's jurisdiction in McIntosh County turned on whether the Creek Nation's
Reservation—contrary to decades-long understanding and prevailing practices—had
actually never been disestablished and remained Indian Country.  The answer to that
question was not yet pronounced when the police and prosecutorial practices here
took place.  Since traditional notions of state sovereignty typically would validate the
police practices here, and the police conduct did not deviate from a state's usual
constitutional exercise of jurisdictional authority, an objectively reasonable basis

19

exists to conclude that state officials acted with a good faith belief in the lawfulness of their conduct.[9]

For these reasons, the district court did not err in denying Mr. Pemberton's motion to suppress stemming from his arrest.

## B.     *Self-Representation at Sentencing*

Mr. Pemberton next argues that the district court violated his constitutionally-guaranteed right to represent himself at sentencing. Mr. Pemberton contends the district court erred in denying, without a formal hearing, Pemberton's request to represent himself at sentencing. Reviewing for abuse of discretion the district court's decision to deny Mr. Pemberton's request to represent himself at sentencing, *see United States v. Piette*, 45 F.4th 1142, 1164 (10th Cir. 2022), we affirm.[10]

The Supreme Court has held that "a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently

---

[9]  Although this case turned on the existence of probable cause and the officers' good faith belief in their jurisdiction, the warrantless arrest and extra-jurisdictional investigation may have complied with the Fourth Amendment if probable cause existed and exigent circumstances were present. *See Green*, 178 F.3d at 1107 (permitting warrantless arrests with probable cause and exigent circumstances to satisfy Fourth Amendment); *see also United States v. Johnson*, 43 F.4th 1100, 1110 (10th Cir. 2022 ("[T]he Fourth Amendment requires only reasonableness[.]") (citation omitted). "Exigent circumstances exist when the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and the manner and scope of the search is reasonable." *United States v. Banks*, 884 F.3d 998, 1012 (10th Cir. 2018).

[10]  Both Mr. Pemberton's and the Government's briefs advocate a de novo standard of review. *See, e.g.*, Aplt. Br. at 15 (advocating de novo review of whether a constitutional violation occurred and clear error review of factual findings underlying the district court's decision to deny the request) (citing *United States v. Tucker*, 451

elects to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975). Ordinarily, a court faced with a motion to proceed pro se conducts an evidentiary hearing to explore whether the defendant understands his right to counsel and what it means to waive that right. A *Faretta* hearing involves "a thorough and comprehensive formal inquiry

---

F.3d 1176, 1180 (10th Cir. 2006)); Aple. Br. at 25 (same) (citing *United States v. Akers*, 215 F.3d 1089, 1097 (10th Cir. 2000)). Yet we have recently concluded that this "ignores the distinction we draw between requests for self-representation made *before* trial, reviewed de novo, and requests made *after* trial, reviewed for abuse of discretion." *United States v. Piette*, 45 F.4th 1142, 1164, n.6 (10th Cir. 2022) (emphasis added); *United States v. Estrada*, 25 F. App'x 814, 820 (10th Cir. 2002) (collecting cases). Indeed, relevant decisions pertain to requests made before trial. *See, e.g.*, *Faretta v. California*, 422 U.S. 806, 835 (1975) ("weeks before trial"); *Akers*, 215 F.3d at 1097 ("more than one month prior to trial"); *United States v. Tucker*, 451 F.3d 1176, 1180 (10th Cir. 2006) ("during voir dire.").

Because Mr. Pemberton's request to proceed pro se occurred post-trial, our precedents require that we review the district court's decision to deny it for abuse of discretion. *See Piette*, 45 F.4th at 1164. To be clear, we have stated that "[a]t any phase of the judicial proceedings, a defendant is permitted to represent himself as a matter of right." *United States v. Vann*, 776 F.3d 746, 762 (10th Cir. 2015). But "the right to self-representation is unqualified only if demanded *before trial*." *United States v. Beers*, 189 F.3d 1297, 1303 (10th Cir. 1999) (emphasis in original). Our precedents suggest that "[w]hen [a] defendant *does not* assert this right *before trial*," we may "review the district court's decision whether to allow [a] defendant to proceed pro se for an abuse of discretion." *Id.* (citing *United States v. Callwood*, 66 F.3d 1110, 1113 (10th Cir. 1995) (emphasis added)). Here, Mr. Pemberton's request came about nine months after his trial opened and closed. *See* R. Vol. 5 at 29. If a defendant requests to represent himself long after the trial, the timing of that request may raise different concerns about the district court's ability to ensure fairness to the defendant. Therefore, it is not unreasonable to review the district court's decision under a different standard of review. *See United States v. Martin*, 203 F.3d 836 (10th Cir. 2000) (reviewing under an abuse of discretion standard the denial of a self-representation request made at the sentencing hearing) (table opinion). Be that as it may, to the extent that the standards differ, we would reach the same conclusion under either standard.

of the defendant on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se." *United States v. Vann*, 776 F.3d 746, 763 (10th Cir. 2015). This hearing ensures the defendant is "not unwittingly or impulsively disposing of his constitutional right to counsel." *Id*.

But in applying *Faretta*, we have held that the "hearing is only a means to an end of ensuring a voluntary and intelligent waiver, and the absence of that means is not error as a matter of law." *Id*. "In other words, a contemporaneous and comprehensive *Faretta* hearing is generally a *sufficient* condition to a knowing waiver, but it is not a *necessary* one." *United States v. Hansen*, 929 F.3d 1238, 1251 (10th Cir. 2019) (cleaned up) (emphasis in original). A criminal defendant has a right to represent himself, *Faretta*, 422 U.S. at 807, but that right is "not absolute." *Akers*, 215 F.3d at 1097.

To proceed pro se, a defendant must meet four requirements. *First*, the defendant must "clearly and unequivocally" inform the district court of his intention to represent himself. *Second*, the request must be timely and not for the purpose of delay. *Third*, the court must conduct a comprehensive formal inquiry to ensure that the defendant's waiver of the right to counsel is "knowingly and intelligently" made. *Fourth*, the defendant "must be able and willing to abide by rules of procedure and

22

courtroom protocol." *United States v. Simpson*, 845 F.3d 1039, 1046 (10th Cir.

2017) (citation and internal quotation marks omitted).

The district court faithfully applied that test. The district court first found that Mr.

Pemberton "clearly and unequivocally" informed the court of his desire to represent

himself at the sentencing hearing, thus satisfying the first requirement. R. Vol. 5 at 30.

But the court also found that "the underlying purpose for [Mr. Pemberton's] request to

proceed pro se cuts against the other three conditions." *Id*. "Consistent with the Court's

approach[,] which eschews formalism in favor of pragmatism," *Hansen*, 929 F.3d at

1251, the district court gave its reasons that informed his determinations regarding the

timeliness and purpose of Mr. Pemberton's request:

> Defendant's *pro se* motion for leave to represent himself pro
> se was filed one week prior to the scheduled sentencing hearing
> and filed <u>only after</u> the Court denied Defendant's *pro se* motion
> for leave to file a motion for judgment of acquittal in excess of
> page limitations and Defendant's *pro se* motion for extension
> of time to file a motion for judgment of acquittal. In these pro
> se motions, Defendant sets forth arguments related to his
> request for acquittal, accusations of ineffective assistance of
> counsel at the trial stage, and various other alleged evidentiary
> issues at trial. Defendant's present Motion explains that
> Defendant wishes to proceed pro se because he and his counsel
> 'have a disagreement about the appropriateness and timing of
> certain arguments that the Defendant wants raised at this
> juncture after trial but prior to a direct appeal.' In yet another
> pro se filing, Defendant complains that Mr. Lund 'should have
> reviewed these issues already and attempted a reservation of
> trial error, yet, he has focused on the sentencing hearing[.]'

R., Vol. 5 at 30-31 (citations and footnote omitted). The district court therefore

found that Mr. Pemberton's request was "untimely." *Id*. at 31. In addition, the

district court determined that Mr. Pemberton's desire to proceed pro se was "not

related to the sentencing hearing" but instead "to raise issues and address arguments that would not properly be before the Court at the time of sentencing." *Id*. After noting examples of Mr. Pemberton's "inability and unwillingness to abide by rules of procedure and courtroom," *id*. at 31 n.2, the district court ultimately found that Mr. Pemberton's request to proceed pro se was "made for the purpose of delay." *Id*. at 31.

The district court's unambiguous findings that Mr. Pemberton's request to proceed pro se was "untimely" and "made for the purpose of delay[ing]" sentencing suffice to foreclose the matter. "A motion for self-representation is untimely when . . . the defendant is attempting to delay the proceeding." *Simpson*, 845 F.3d at 1053. And a finding that a defendant requests to proceed pro se merely to delay the proceeding permits the district court to properly deny that request. *Cf. Akers*, 215 F.3d at 1097 (A "district court properly denies a request for self-representation where it finds the request was made to delay the trial.").

In sum, the district court determined that Mr. Pemberton focused on issues unrelated to sentencing, waited until one week before the sentencing hearing, and continuously ignored court procedures on filing motions. We conclude that these determinations amply support the finding that Mr. Pemberton's request to proceed pro se was "untimely" and "made for the purpose of delay[ing]" sentencing.

Consequently, the district court did not violate Mr. Pemberton's constitutionally-guaranteed right to represent himself when it denied his request to proceed pro se.[11]

\*     \*     \*

Accordingly, we **AFFIRM** the denial of Mr. Pemberton's motion to suppress and **AFFIRM** the denial of Mr. Pemberton's request to represent himself at sentencing.

---

[11] Though represented by counsel, Mr. Pemberton submitted several pro se filings to this court after counsel filed the opening brief. "It is our policy on direct appeals such as this only to address issues raised by counsel, who have been trained and in many cases appointed for that very purpose[.]" *United States v. Coleman*, 9 F.3d 1480, 1487 (10th Cir. 1993).

We accordingly invoke our policy of addressing on direct appeal only those issues raised by counsel, and we decline to address the issues raised in Mr. Pemberton's proffered pro se documents—including his ineffective assistance of counsel claims. To the extent that Mr. Pemberton claims ineffective assistance of counsel, those claims are appropriately pressed on a collateral attack under 28 U.S.C. § 2255. *See, e.g.*, *United States v. Grigsby*, 749 F.3d 908, 911 n.6 (10th Cir. 2014) (declining to address pro se filing claim of ineffective assistance of counsel on direct appeal because such a claim is properly brought on collateral attack under 28 U.S.C. § 2255).